699 F.2d 79
 Fed. Sec. L. Rep. P 99,073
Michael F. ARMSTRONG, as Receiver of Capital Growth Company,
S.A. (Costa Rica) and Capital Growth Company, S.A. (Panama),
Robert Moore, suing on his own behalf and derivatively on
behalf of Capital Growth Fund, and Francesco Galofaro, suing
on his own behalf and derivatively on behalf of Capital
Growth Real Estate Fund, Inc., Plaintiffs-Appellants-Cross-Appellees,
v.
Clovis McALPIN, Capital Growth Real Estate Fund, Inc.,
Defendants-Appellees-Cross-Appellants,
New Providence Securities, Ltd., S.A., New Providence
Securities, Ltd., Arawak Trust Company, Ltd., Brown Brothers
Harriman & Co., Goldman, Sachs & Co., EHG Enterprises Inc.,
Sheffield Advisory Company, Sheffield Advisory Company,
S.A., Fiduciary Trust Company, Bradford Trust Company, Sion
Plaza, S.A., Sanford C. Shultes, Ariel E. Gutierrez, Enrique
Gutierrez, Joseph D. Schwerin, Koitcho Beltchev, Capital
Growth Management Company, Ltd., Hayden Stone & Co., Alberto
Alvarez, Antonio Pena Chavarria, Hacienda Cafetalera Santa
Elena, Ltd., Jose Figueres Ferrer, Moore & Schley, Cameron &
Co., William Hutchinson & Co., R.H. Pringle, P.J. Rafferty,
Sociedad Agricola Industrial San Cristobal, S.A., and
Capital Growth Fund, Defendants-Appellees.
 Nos. 605, 898, Dockets 81-7634, 81-7654.
 United States Court of Appeals,
Second Circuit.
 Argued May 17, 1982.
Decided Jan. 24, 1983.
 
 Kent T. Stauffer, New York City (Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov and Mathew E. Hoffman, New York City, on brief), for plaintiffs-appellants-cross-appellees Armstrong, Moore and Galofaro.
 J. Robert Lunney, New York City (Lunney & Crocco, Michael J. McAllister and James J. DeLuca, New York City on brief), for defendants-appellees-cross-appellants Clovis McAlpin and Capital Growth Real Estate Fund, Inc.
 Matthew Gluck, New York City (Fried, Frank, Harris, Shriver & Jacobson, New York City, on brief), for defendants-appellees Arawak Trust Co., Ltd., R.H. Pringle, P.J. Rafferty.
 William E. Wurtz, New York City (Davis, Polk & Wardwell, James W.B. Benkard and Paul W. Bartel, New York City, on brief), for defendant-appellee Brown Brothers Harriman & Co.
 James E. Tyrell, New York City (Sullivan & Cromwell and Marvin Schwartz, New York City, on brief), for defendants-appellees Goldman, Sachs & Co.
 Mary L.B. Betts, New York City (LeBoeuf, Lamb, Leiby & MacRae and Taylor R. Briggs, New York City, on brief), for defendant-appellee Bradford Trust Co.
 Edward C. McLean, Jr., New York City (Chadbourne, Parke, Whiteside & Wolff and Edwin D. Scott, New York City, on brief), for defendant-appellee HS Equities, Inc.
 James J. Maloney, New York City (Rogers & Wells and Barbara J. Green, New York City, on brief), for defendant-appellee Moore & Schley, Cameron & Co.
 James J. Terry, New York City (Cole & Deitz and Robert E. Kushner, New York City, on brief), for defendant-appellee William Hutchinson & Co.
 Before WATERMAN and VAN GRAAFEILAND, Circuit Judges, and POLLACK, District Judge.*
 VAN GRAAFEILAND, Circuit Judge:
 
 
 1
 Plaintiffs-appellants appeal from a judgment of the United States District Court for the Southern District of New York (Werker, J.) dismissing their securities fraud complaint on motion of the defendants. Cross-appellants appeal from the order of Judge Werker denying their motion to disqualify plaintiffs' attorneys. We affirm the judgment in part and reverse and remand it in part. Because we are reversing the judgment in favor of cross-appellant McAlpin and remanding for further proceedings as to him, we dismiss the cross-appeal from the disqualification order on the ground that the order no longer is final in character.
 
 
 2
 In 1962, a Texas resident named Clovis W. McAlpin moved to Nassau, Bahamas, where he organized New Providence Securities, Ltd. and became active in the field of investment management. McAlpin retained ownership of approximately sixty percent of New Providence's stock and became its chief executive officer.
 
 
 3
 On July 24, 1962, New Providence and Chase Manhattan Trust Corporation, Ltd., another Bahamian company, entered into a trust agreement pursuant to which Chase became the trustee of an investment trust to be known as First Bahamas Investment Trust. Under the terms of the trust agreement, the purchases and sales of trust assets were to be the sole prerogatives of New Providence, the trustee's obligations in substance being the administration and custodianship of the trust property. The trustee was authorized to take such action as it believed in good faith was for the benefit of the trust property, and, in any litigation regarding the trust property in which the trustee was a party, it would be deemed to represent the shareholders of the trust. The certificates to be issued to shareholders were to contain provisions that the shareholders would be bound by the provisions of the trust agreement.
 
 
 4
 First Bahamas was an open-end mutual fund, whose projected rate of growth was based in large measure upon the leverage authorization given it to borrow amounts equal to seventy percent of the gross value of the trust property. However, First Bahamas was limited in its investments to the shares of SEC-approved open-end mutual funds or trusts and United States Treasury Bills.
 
 
 5
 On September 10, 1963, appellee Arawak Trust Company, Ltd. succeeded Chase Manhattan as trustee. Arawak had been organized by Kleinwort, Benson, Ltd., a leading London merchant banking house, and appellees Goldman, Sachs & Co. and Brown Brothers Harriman & Co. became shareholders of Arawak at Kleinwort, Benson's request, each of them owning approximately a ten percent interest in the company. Although Kleinwort, Benson and the Canadian Imperial Bank of Commerce each owned approximately a twenty percent interest in Arawak, neither was named as a defendant herein. In 1965, the name of First Bahamas Investment Trust was changed to Capital Growth Fund.
 
 
 6
 The trust agreement provided that it could be amended for any reason, provided the interests of the shareholders were not adversely affected thereby. If an amendment was made, the trustee was required to give each shareholder twenty days written notice setting forth the details of the amendment and the reasons therefor. On August 8, 1967, Arawak and New Providence sent letters to shareholders notifying them of proposed changes in the trust deed. Arawak's letter contained the precise language of the change, which was in substance that trust property would thereafter be invested in open-end investment companies or trusts, "the Investment Advisor of which" was registered with the SEC. New Providence's letter informed shareholders:
 
 
 7
 Instead of investing in U.S. mutual funds, we will invest in our own--five or more--open end investment trusts supervised by some of the best Investment Advisors in the United States. These Investment Advisors are all registered with the Securities and Exchange Commission in the United States.
 
 
 8
 Since the subsidiary trusts, unlike the parent trust, were not restricted in their choice of investments, the change proved to be an unhappy one for the shareholders. Extensive purchases and sales of common stock led to a substantial increase in handling and brokerage fees. Moreover, several of the subsidiary trusts' major investments were, at best, questionable in character.
 
 
 9
 In 1970, McAlpin formed the Capital Growth Real Estate Fund, a Panamanian investment company; and Capital Growth Management, a subsidiary of New Providence, became the Real Estate Fund's investment manager. The Real Estate Fund received $10,000,000 in assets from Capital Growth Fund in exchange for stock. Shortly after its formation, the Real Estate Fund also engaged in a series of questionable financial transactions.
 
 
 10
 On October 16, 1970, Arawak notified McAlpin that it wanted to resign as trustee, and asked that a new trustee be appointed. When McAlpin failed to comply with Arawak's request, Arawak petitioned the Bahamas Supreme Court to make the appointment. Although the record is somewhat obscure on this point, it appears that on April 7, 1971, the Court appointed Banco Anglo Costarricence of San Jose, Costa Rica, as trustee in place of Arawak, and, on May 4, 1971, Banco Anglo Costarricence was succeeded by appellee Sion Plaza, S.A., a Costa Rican corporation.
 
 
 11
 McAlpin then formed appellee Capital Growth Fund, S.A. under the laws of Costa Rica and merged the old Capital Growth Fund into the new one. To prevent shareholders from redeeming their shares, as they could under the existing open-end trust provisions, McAlpin, in July, 1971, took advantage of liberal Costa Rican laws to convert unilaterally the Costa Rican Fund from open-end to close-end. In August, 1971, the Fund's name was changed to Capital Growth Company, S.A., and the Real Estate Fund was merged into it. McAlpin then formed New Providence Securities, Ltd. (Panama), and the new firm became the investment manager for Capital Growth Company, S.A. In a complicated series of transactions, New Providence Securities, Ltd. became the owner of Capital Growth Company's common stock, and the fundholders' shares were converted to preferred stock.
 
 
 12
 In 1973, the Securities and Exchange Commission launched an investigation into McAlpin's activities, which culminated in an enforcement action brought in the United States District Court for the Southern District of New York on September 3, 1974. See SEC v. Capital Growth Company, S.A. (Costa Rica), et al., 391 F.Supp. 593 (S.D.N.Y.1974). On September 24, 1974, the court appointed Michael F. Armstrong receiver for the Capital Growth Companies. Id. at 596. On September 17, 1976, Armstrong filed the instant action. Joining him as plaintiffs were Robert Moore, a shareholder of the original Capital Growth Fund, and Francesco Galofaro, the owner of a Capital Growth Real Estate Fund debenture, each of them suing derivatively on behalf of his Fund.
 
 
 13
 At a pretrial conference held on February 4, 1977, discussions were had concerning asserted insufficiencies in plaintiffs' complaint and the possibility of avoiding burdensome and expensive motions addressed to the complaint. Apparently satisfied that some of defendants' objections had merit, plaintiffs, on April 22, 1977, filed an amended complaint. On January 26, 1978, Judge Werker dismissed without prejudice seven of the causes of action alleged in the amended complaint, and on April 3, 1978, plaintiffs filed a second amended complaint.
 
 
 14
 On June 1, 1978, the attorneys for McAlpin and Capital Growth Real Estate Fund, Inc. moved to disqualify the firm of attorneys representing plaintiffs as trial counsel because Theodore Altman, a partner in that firm, had been on the SEC staff and had actively participated in the Commission's investigation of McAlpin's companies. Judge Werker denied the motion, 461 F.Supp. 622 (S.D.N.Y.1978), and his order was affirmed by this Court, 625 F.2d 433 (2d Cir.1980) (en banc). However, the Supreme Court vacated the en banc decision on the ground that the interlocutory order denying the motion to disqualify was not appealable. 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).
 
 
 15
 Following the Supreme Court's decision, Judge Werker took up defendants' pending motions to dismiss the second amended complaint. In an opinion and order dated July 14, 1981, he dismissed the complaint as to all defendants. [Current] Fed.Sec.L.Rep. (CCH) p 98,255. This appeal followed.
 
 Discussion
 
 16
 Although the second amended complaint is fifty-seven printed pages in length and asserts twenty causes of action against thirty defendants, the liability of each defendant arises out of that defendant's connection with one or more of the following alleged wrongful acts or series of wrongful acts:
 
 I.
 
 17
 The 1967 change in the terms of the trust agreement, already discussed, which allegedly resulted in the "fraudulent" payment of in excess of $4,240,750 in fees to New Providence. McAlpin, New Providence, Arawak, Brown Brothers, Goldman, Sachs, and Pringle and Rafferty, Arawak officers, are sought to be charged with liability. (First and Second Causes of Action.)
 
 II.
 
 18
 In 1968, one of the subsidiary trusts entered into a joint venture with a Costa Rican partnership, controlled by appellee Jose Figueres Ferrer, to form the corporate appellee, Sociedad Agricola Industrial San Cristobal, S.A. The trust invested $2,000,000 in cash, and the partnership contributed its assets, which, although they actually had a negative partnership book value of $157,000 were valued on the corporation's books at $3,000,000. For its investment, the trust received $2,000,000 in common stock. The partnership received $2,000,000 in common stock and $1,000,000 in preferred stock. Recovery of $2,055,000 is sought against McAlpin, New Providence, Figueres, and San Cristobal, as principals, appellee Alberto Alvarez as broker, appellee Koitcho Beltchev as investment advisor, and appellee Hayden Stone & Co. as Beltchev's employer. Arawak, Rafferty, and Pringle are also charged with liability because, it is alleged, they took no steps to prevent or avoid the transaction and Arawak subsequently resigned as trustee without making disclosure of the facts. (Third, Fourth, and Fifth Causes of Action.)
 
 III.
 
 19
 In September, 1969, one of the subsidiary trusts purchased 200,000 shares of appellee EHG Enterprises Inc., a Puerto Rican corporation controlled by appellees, Ariel and Enrique Gutierrez. The purchase price of $2,005,000 was allegedly far in excess of the stock's market value. Upon receipt of the money, EHG paid New Providence $100,000 as a brokerage commission, "loaned" New Providence an additional $400,000 and purchased $400,000 worth of bonds issued by the National Liberation Party of Costa Rica.
 
 
 20
 In September, 1972, Ariel Gutierrez purchased the 200,000 shares by paying $1,000,000 to New Providence, $300,000 to McAlpin personally, and $10,000 to a third party who assisted in consummating the deal.
 
 
 21
 McAlpin, New Providence, EHG, Ariel Gutierrez and Enrique Gutierrez are charged as principals, Beltchev, appellee Sheffield Advisory Company, S.A. and appellee Sanford Shultes as investment advisors, Alvarez as broker or intermediary, and Pringle and Rafferty as officers of Arawak. Recovery in the amount of $1,005,000 is sought. (Sixth, Seventh, and Eighth Causes of Action.)
 
 IV.
 
 22
 Between October, 1970 and September, 1972, Growth Fund and the Capital Growth Companies executed approximately $247,000,000 in securities transactions, and fees of $1,100,000 and $1,400,000 were paid to New Providence and Beltchev respectively. In addition, $300,000 in commissions was paid to others. The average turnover rate approximated 550% in 1971, and 900% in 1972. McAlpin and New Providence are charged as the instigators of this alleged churning scheme, and Beltchev is charged as participating broker and aider and abettor. Recovery in the total amount of $2,800,000 is also sought from appellee Moore & Schley, a brokerage firm, which employed Beltchev from March 2, 1970, to December 8, 1971, and appellee William Hutchinson & Co., another brokerage firm, which employed Beltchev from December 8, 1971 to December 13, 1972. Shultes is alleged to have been an investment advisor in search of commissions, and Sheffield is alleged to be liable as Shultes' employer. Beltchev, Shultes, Sheffield, Arawak, Pringle and Rafferty are all claimed to have been aiders and abettors. Goldman, Sachs, and Brown Brothers allegedly are liable as controlling persons. (Ninth, Tenth, and Eleventh Causes of Action.)
 
 V.
 
 23
 Between 1969 and 1971, Arawak allegedly failed to recover from New Providence the full purchase price for $700,000 worth of Fund share certificates. McAlpin, New Providence, Arawak, Pringle, and Rafferty are charged with liability for this "loan". (Twelfth Cause of Action.)
 
 VI.
 
 24
 Between 1970 and 1971, New Providence, through Capital Growth Management, had improperly borrowed $2.4 million from the Real Estate Fund which has not been repaid. Recovery is sought from McAlpin, New Providence, and Capital Growth Management, on behalf of the Real Estate Fund. (Twelfth Cause of Action.)
 
 VII.
 
 25
 Arawak resigned as trustee without revealing its knowledge of McAlpin's wrongdoing and without taking appropriate steps to protect the shareholders' interests. (Thirteenth Cause of Action.)
 
 VIII.
 
 26
 In 1971, appellee Fiduciary Trust Company, bank custodian for the Growth Fund, transferred, at the direction of trustee, Sion Plaza, S.A., $5,900,000 of the Fund's assets to a custody account for Capital Growth Fund, S.A., the newly-formed Costa Rican corporation. In 1972, the custody account was closed. Recovery of $5,900,000 is sought against Fiduciary, its vice-president, Joseph Schwerin, Sion Plaza, Sion Plaza's president, Antonio Pena Chavarria, New Providence, and McAlpin. (Fourteenth and Sixteenth Causes of Action.)
 
 IX.
 
 27
 The formation of the Costa Rican Funds and Companies, the transfer of assets and the close-ending of the Funds, as above described. Liability in an unspecified amount is asserted against McAlpin, New Providence, and "certain of the other defendants". (Fifteenth Cause of Action.)
 
 X.
 
 28
 In September, 1970, the Real Estate Fund purchased all the shares of appellee Hacienda Cafetalera Santa Elena, Ltd., a San Cristobal subsidiary, the consideration being 251,141 shares of the Real Estate Fund and 400,000 shares of Capital Growth Management Company. The Real Estate Fund paid a commission of $348,000 to Capital Growth Management Company and a finder's fee of $50,000 to Alberto Alvarez. At the time of purchase, Santa Elena had a negative book value. Recovery on behalf of Real Estate Fund is sought against McAlpin, New Providence, Figueres, San Cristobal, Santa Elena, Capital Growth Management, and Alvarez. (Seventeenth Cause of Action.)
 
 XI.
 
 29
 During 1973, Bradford Trust Company, custodian of Capital Growth Company assets, transferred approximately $2.2 million to various persons "who were unrelated to the business of the Capital Growth Companies." Recovery is sought against Bradford, two of its officers, Schwerin and Shultes, McAlpin and New Providence. (Eighteenth and Nineteenth Causes of Action.)
 
 XII.
 
 30
 In 1971, the Capital Growth Company redeemed its shares held by Santa Elena for $2,000,000. Also, from time to time, Capital Growth Companies advanced a total of $1,040,000 to Santa Elena. Liability for $3,040,000 is asserted against McAlpin, New Providence, New Providence, S.A., Figueres, San Cristobal, and Santa Elena. (Twentieth Cause of Action.)
 
 The Statute of Limitations
 
 31
 In actions alleging fraudulent violations of the federal securities laws, which are brought in the district courts sitting in New York State, the New York statute of limitations for actions based on common law fraud customarily is applied. Stull v. Bayard, 561 F.2d 429, 431 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978). Although federal law determines when the State statute starts to run, the onset periods for actions such as this are substantially the same in both jurisdictions. Id. at 432. Accordingly, the federal plaintiff, like a State plaintiff, must sue within six years from the time the cause of action accrued or within two years from the time the wrongdoing was, or with reasonable diligence should have been, discovered. Id.
 
 
 32
 Because the instant action was not commenced until September 17, 1976, the appellees whose alleged wrongdoing preceded September 17, 1970, asserted a statute of limitations defense. Appellants contend, however, that the statute of limitations did not start to run until Armstrong's appointment as receiver on September 24, 1974, and, that since this action was commenced within two years of that date, the statute of limitations is not available as a defense. In support of their argument, appellants rely upon the line of cases which hold that, where an action is brought on behalf of an entity which has been defrauded by persons who completely dominated and controlled it, the statute of limitations is tolled as to the controlling wrongdoers during the period of their domination and control. See, e.g., Adams v. Clarke, 22 F.2d 957, 959 (9th Cir.1927); Michelsen v. Penney, 135 F.2d 409, 415-16 (2d Cir.1943); Moviecolor Ltd. v. Eastman Kodak Co., 288 F.2d 80, 88 (2d Cir.), cert. denied, 368 U.S. 821, 82 S.Ct. 39, 7 L.Ed.2d 26 (1961); International Railways of Central America v. United Fruit Co., 373 F.2d 408, 414 (2d Cir.), cert. denied, 387 U.S. 921, 87 S.Ct. 2031, 18 L.Ed.2d 975 (1967); IIT, An International Investment Trust v. Cornfeld, 619 F.2d 909, 930 (2d Cir.1980). Before this doctrine can be applied, however, the plaintiff "has the burden of showing 'a full, complete and exclusive control in the directors or officers charged.' " International Railways of Central America v. United Fruit Co., supra, 373 F.2d at 414 (quoting Payne v. Ostrus, 50 F.2d 1039, 1042 (8th Cir.1931)). Appellants' complaint does not show that they are prepared to meet this burden.
 
 
 33
 Appellants' complaint alleges wrongdoing by fourteen corporations, three "firms", three partnerships, and ten individuals. It fails to name the officers and directors of a single corporation. The record discloses, however, that, in 1966, New Providence had a nine-man board of directors, which included a member of the Bahamian Senate, a New York City management consultant, the president of a New York advertising agency, the senior vice president of a Washington bank, and the former president of a major United States insurance company. By 1968, the make-up of the board had changed substantially. However, the Bahamian senator was still a member, and four of the remaining members were United States residents. By 1969, a London director had been added.
 
 
 34
 None of these men has been sued, and the complaint does not allege that all or any of them were dominated and controlled by McAlpin during the periods involved herein. The record is silent as to the identity of the directors of Capital Growth Management Company, Capital Growth Real Estate Fund, Inc., Capital Growth Company, S.A. (Costa Rica), Capital Growth Fund, S.A., Capital Growth Company, S.A. (Panama), or any of the other corporations which allegedly participated in the wrongdoing. We know that Kleinwort, Benson and the Canadian Imperial Bank of Commerce owned substantial interests in Arawak and that there were eleven members in addition to appellee, Pringle, on its board of directors, not one of whom has been charged with wrongdoing in this action. Moreover, it is undisputed that the managements of New Providence and Arawak were separate and distinct from each other and that there was no financial connection between the two companies.
 
 
 35
 Appellants' second amended complaint, dated April 3, 1978, alleges that "[t]he Capital Growth Companies are now located in Costa Rica where, upon information and belief, they are under the domination and control of defendant McAlpin, the perpetrator of most of the abuses cited in this complaint." The words in this allegation, for which we have supplied emphasis, demonstrate how far short the allegation falls of alleging "full, complete and exclusive" control by any defendant between 1966 and 1976, so as to toll the running of the statute of limitations during any part of that period.
 
 
 36
 Assuming for the argument only that appellants' complaint adequately alleges exclusive domination and control, the district court nonetheless did not err in holding that the shareholders as a class should have known that skulduggery was taking place, so as to charge the Growth Companies with the same knowledge. See Mencher v. Richards, 256 A.D. 280, 282-83, 9 N.Y.S.2d 990 (1939); White v. Federal Deposit Ins. Corp., 122 F.2d 770, 775-76 (4th Cir.1941), cert. denied, 316 U.S. 672, 62 S.Ct. 1043, 86 L.Ed. 1747 (1942); 3 Fletcher Cyc. Corp. Sec. 814 (1975); 19 C.J.S. Corporations Sec. 1079(c) (1940).
 
 
 37
 The test as to when fraud should with reasonable diligence have been discovered is an objective one. Warner v. Republic Steel Corp., 103 F.Supp. 998, 1009 (S.D.N.Y.1952). "[T]he means of knowledge are the same thing in effect as knowledge itself." Wood v. Carpenter, 101 U.S. 135, 143, 25 L.Ed. 807 (1879). "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." Higgins v. Crouse, 147 N.Y. 411, 416, 42 N.E. 6 (1895). This rule is fully applicable in cases such as the instant one, which involve claims of securities fraud. See Arneil v. Ramsey, 550 F.2d 774, 781-82 (2d Cir.1977); Klein v. Shields & Co., 470 F.2d 1344, 1346-47 (2d Cir.1972); Klein v. Bower, 421 F.2d 338, 342-44 (2d Cir.1970); Morgan v. Koch, 419 F.2d 993, 996-98 (7th Cir.1969).
 
 
 38
 The tortuous history of the Fund, as outlined above, bore the readily recognizable earmarks of financial shenanigans. Moreover, prospectuses and financial statements disclosed the pernicious effects of the changes in the Fund's holdings. For example, the Fund's March 31, 1969 quarterly report listed over 100 common stocks "held through the medium of wholly owned open-end trusts." Prospectuses and financial statements showed that New Providence's commissions, which were $5,109 for the quarter ending June, 1967, had increased to $459,078 for the quarter ending March, 1969. Prospectuses also showed that the excess of expenditures over income, which was $173,727 for the quarter ending June, 1967, had increased to $785,861 for the quarter ending September, 1968 and to $929,347 for the quarter ending March, 1969. The well-publicized SEC action, which preceded the instant suit by more than two years, set forth in considerable detail many of the wrongs for which appellants now seek recovery. Indeed, a comparison of Peat Marwick & Mitchell's 1973 audit report of the Growth Fund, which was made public when the SEC complaint was filed, and the complaint herein, which was filed more than two years later, demonstrates that most of appellants' allegations of pre-1970 wrongdoing were simply lifted from the accountants' report. Moreover, SEC staff members, including attorney Altman, had been working with this report as early as 1973. In this modern litigious age in which class actions proliferate, see, e.g., Steinberg v. Carey, 470 F.Supp. 471 (S.D.N.Y.1979), there was no compelling reason to toll the statute of limitations in favor of shareholders who knew or should have known that they were being defrauded.
 
 
 39
 Under the foregoing circumstances, the district court did not err in holding that, by exercising reasonable diligence, Capital Growth's shareholders, some of whom were United States residents, could have discovered the alleged fraudulent conduct more than two years prior to the time the instant action was brought. Arneil v. Ramsey, supra, 550 F.2d at 781; Berry Petroleum Co. v. Adams & Peck, 518 F.2d 402, 410-11 (2d Cir.1975); Hupp v. Gray, 500 F.2d 993, 996-97 (7th Cir.1974). Appellants' generalized and conclusory allegations of fraudulent concealment do not satisfy the requirements of Fed.R.Civ.P. 9(b). Moviecolor Ltd. v. Eastman Kodak Co., supra, 288 F.2d at 87; Suckow Borax Mines Consolidated, Inc. v. Borax Consolidated, Ltd., 185 F.2d 196, 209 (9th Cir.1950), cert. denied, 340 U.S. 943, 71 S.Ct. 506, 95 L.Ed. 680 (1951); Gee v. CBS, Inc., 471 F.Supp. 600, 628 (E.D.Pa.), aff'd, 612 F.2d 572 (3rd Cir.1979) (mem.); Chambers & Barber, Inc. v. General Adjustment Bureau, Inc., 60 F.R.D. 455, 458 (S.D.N.Y.1973). See Glover v. National Bank of Commerce, 156 A.D. 247, 257, 141 N.Y.S. 409 (1913).
 
 
 40
 A receiver stands in the shoes of the person for whom he has been appointed and can assert only those claims which that person could have asserted. Lank v. New York Stock Exchange, 548 F.2d 61, 67 (2d Cir.1977). See Porter v. Sabin, 149 U.S. 473, 480, 13 S.Ct. 1008, 1010, 37 L.Ed. 815 (1893). Accordingly, defenses such as the statute of limitations, which might have been interposed against persons represented by a receiver may be interposed against the receiver. 1 Clark, Receivers Sec. 268.1 (3d ed. 1959); 16 Fletcher Cyc. Corp. Sec. 7801 (1979); 75 C.J.S. Receivers Sec. 328 (1952). Our opinion in IIT, An International Investment Trust v. Cornfeld, supra, 619 F.2d 909, does not, as appellants urge, require that a different rule be applied in the instant case. In IIT, "the affidavits in support of the motions to dismiss on the basis of the statute of limitations [made] no adequate allegation that the circumstances alleged to have given notice of the fraud would reasonably have become known to the fundholders, only a few of whom lived in the United States." Id. at 932. In the instant case, any fundholder who did not suspect chicanery as he watched the skyrocketing of fees and expenses, the takeover of Funds and corporations by new and alien corporations, and the close-ending of open-end funds must have had his head in the sand.
 
 
 41
 When the district judge dismissed appellants' amended complaint, he said, quoting Saylor v. Lindsley, 302 F.Supp. 1174, 1187 (S.D.N.Y.1969), that appellants must amend their complaint to "show with specificity the circumstances of the alleged fraudulent concealment and its discovery." This echoed Judge Friendly's statement in Moviecolor Ltd. v. Eastman Kodak Co., supra, 288 F.2d at 88, (quoting Stearns v. Page, 1849, 7 How. 819, 829, 12 L.Ed. 928) that a plaintiff must make "distinct averments as to the time when the fraud, mistake, concealment, or misrepresentation was discovered, and what the discovery is, so that the court may clearly see, whether, by the exercise of ordinary diligence, the discovery might not have been before made." In dismissing appellants' second amended complaint, the district court said "Plaintiffs fail to allege what material facts or information were discovered when Armstrong became the Receiver, which were not previously available to the shareholders of the Fund." We agree.
 
 
 42
 Two of the causes of action in appellants' complaint are asserted on behalf of Capital Growth Real Estate Fund, Inc., the Panamanian corporation formed by McAlpin in 1970. These involve the alleged 1970-71 "loan" of $2.4 million by the Real Estate Fund to New Providence and Fund's alleged wrongful payment of $398,000 in commissions in connection with the 1970 Santa Elena deal. Under New York State's borrowing statute, New York Civil Practice Law Sec. 202 (McKinney 1972), the statute of limitations of the place where the loss was sustained normally is applied, Industrial Consultants, Inc. v. H.S. Equities, Inc., 646 F.2d 746, 747 (2d Cir.), cert. denied, 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981), and, in this case, that place was Panama. See id.; Korn v. Merrill, 403 F.Supp. 377, 385-86 (S.D.N.Y.1975), aff'd without opinion, 538 F.2d 310 (2d Cir.1976).
 
 
 43
 The district court held that the statute of limitations of Panama requires that suit be brought within one year from the time the fraud was or should have been discovered. Although appellants question the adequacy of appellees' proof of Panamanian law, we believe that enough was shown to support the district court's determination. Accordingly, since it is undisputed that the alleged fraud was discovered more than one year prior to suit, the district court did not err in holding that these two claims are barred as against all appellees.
 
 
 44
 The district court mistakenly treated the alleged failure of the trustee, between 1969 and 1971, to collect $700,000 owed by New Providence to the Growth Fund as governed by the Panama statute of limitations. Nonetheless, as against Arawak, its shareholders and officers, this cause of action should have been dismissed for failure to allege the existence of a manipulative or deceptive device or contrivance, or a scheme or artifice to defraud, as required by section 10(b), 15 U.S.C. 78j(b), and Rule 10b-5, promulgated thereunder. The breach of a fiduciary duty, standing alone, does not violate this section. Santa Fe Industries v. Green, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977); O'Neill v. Maytag, 339 F.2d 764, 767-68 (2d Cir.1964). While fraudulent concealment of such a breach might satisfy the requirements of a 10(b) claim, as we have already pointed out, generalized and conclusory allegations of fraudulent concealment do not satisfy the requirements of Fed.R.Civ.P. 9(b).
 
 
 45
 Although the complaint alleges that the defendants "fraudulently concealed" the improper "loan" in their communications to shareholders, the only communication identified in the complaint is the March 30, 1971 report to shareholders in which the existence of the "loan" concededly was disclosed. So far as Arawak is concerned, plaintiffs' allegation that "[i]n each communication to shareholders issued from 1969 until September, 1974 when Armstrong was appointed Receiver, these defendants actively concealed the facts by failing to disclose them to the shareholders," does not satisfy the specificity requirements of Rule 9(b). See Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 116-17, 119-20 (2d Cir.1982). Arawak, which resigned as trustee in April, 1971, was entitled to know what "facts" it is alleged to have "concealed by failing to disclose" during its tenure as trustee and in which of its communications such concealment took place. Circumlocution does not belong in a complaint alleging fraud. If plaintiffs claim that Arawak fraudulently misrepresented that certain payments had been made on the outstanding indebtedness from New Providence, they could have alleged simply and directly the pertinent facts. They did not!
 
 Churning
 
 46
 The district judge dismissed appellants' churning claims against McAlpin and New Providence because he believed that under the securities laws churning could only be charged against a broker or dealer. This was error. "Churning" is a synonym for "overtrading", Hazard & Christie, The Investment Business 68 (1964), and simply refers to the excessive rate of turnover in a controlled account for the purpose of increasing the amount of commissions, Ruskay v. Waddell, 552 F.2d 392, 393 n. 2 (2d Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); 11A Part 1 Gadsby, Business Organizations Sec. 6.03 (1982).
 
 
 47
 Traditionally, allegations of churning have been made against broker-dealers who are in a position to make discretionary decisions concerning the number and type of transactions made on behalf of an investor. See, e.g., Moscarelli v. Stamm, 288 F.Supp. 453 (E.D.N.Y.1968). However, when the investment entity is structured so that an individual or organization has the control over investment decisions that usually belongs to a broker-dealer, the controlling agent is a potential churner. The fiduciary obligations which an investment manager owes to a fund, In re Gartenberg, 636 F.2d 16, 18 (2d Cir.1980), cert. denied, 451 U.S. 910, 101 S.Ct. 1979, 68 L.Ed.2d 298 (1981), and the control it exercises over the fund's investments are as great as those of a broker. We see no reason why it should not be held liable under section 10(b) for churning the fund despite the fact that it is neither a dealer nor a broker. See Lutz v. Boas, 39 Del.Ch. 585, 604-08, 171 A.2d 381, 393-95 (1961).
 
 
 48
 The provisions of 17 CFR 240.15(c)1-7(a), which define churning in the context of overtrading by a broker or dealer, do not mandate a different conclusion. That regulation is interpretive of section 15(c)(1) of the Securities and Exchange Act, 15 U.S.C. Sec. 78o (c)(1), which is limited in its scope to the regulation of brokers and dealers. In any event, New Providence held itself out to be a "broker-dealer", and, for purposes of the motions addressed to the complaint, is in a poor position to claim otherwise.
 
 
 49
 The district court also believed that the charge of churning was defective for failing to allege misrepresentation of the withholding of material facts by McAlpin. This, too, was error. Churning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct. Newburger, Loeb & Co. v. Gross, 563 F.2d 1057, 1069-70 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1209 (9th Cir.1970). The district court's reliance upon Santa Fe Industries v. Green, supra, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 was misplaced. That case did not involve the deceptive or manipulative type of practice that is proscribed by section 10(b). Id. at 474, 97 S.Ct. at 1301. Churning, as allegedly practiced in this case, may. The churning claim against McAlpin and New Providence should not have been dismissed on motion.
 
 
 50
 However, with respect to the charge that others aided and abetted the alleged churning, liability has been alleged adequately only against appellee Beltchev. The general requirements for establishing aiding and abetting liability are well settled in this Circuit. Plaintiffs must prove (1) a securities law violation by a primary wrongdoer, (2) knowledge of the violation by the person sought to be charged, and (3) proof that the person sought to be charged substantially assisted in the primary wrongdoing. IIT, An International Investment Trust v. Cornfeld, supra, 619 F.2d at 922. Whether a reckless disregard of the facts is sufficient to satisfy the requirement of knowledge has not yet been decided by the Supreme Court. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193-94 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976). However, in the Second Circuit, if the alleged aider and abettor owes a fiduciary duty to the plaintiff, recklessness is enough. IIT, An International Investment Trust v. Cornfeld, supra, 619 F.2d at 923. If there is no fiduciary duty, the "scienter" requirement scales upward--the assistance rendered must be knowing and substantial. Edwards & Hanly v. Wells Fargo Securities Clearance Corp., 602 F.2d 478, 484 (2d Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). Inaction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, except when it was designed intentionally to aid the primary fraud or it was in conscious and reckless violation of a duty to act. IIT, An International Investment Trust v. Cornfeld, supra, 619 F.2d at 925-27.
 
 
 51
 The complaint alleges that, for a period of ten years, appellee Beltchev was a shareholder in New Providence and the broker and an investment advisor for the Growth Companies and that he acted as broker for substantially all the churning transactions with knowledge of their fraudulent nature in order to generate commissions for himself, New Providence, and his employers. The complaint also alleges that "McAlpin was able to effect the various securities transactions comprising the violations herein by directing substantially all of them to Beltchev, at each of the various brokerage houses where Beltchev was employed during the relevant period." Although we are not prepared to hold that a broker who merely executes an investment manager's orders for improper purchases or sales can be held liable as an aider and abettor of the investment manager, see Cumis Insurance Society, Inc. v. E.F. Hutton & Co., 457 F.Supp. 1380, 1386-88 (S.D.N.Y.1978), appellants charge Beltchev with greater wrongdoing than that. See Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 48 (2d Cir.), cert. denied, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); Kaufman v. Merrill Lynch, Pierce, Fenner & Smith, 464 F.Supp. 528, 536 (D.Md.1978); Faturik v. Woodmere Securities, Inc., 431 F.Supp. 894, 896 (S.D.N.Y.1977). A decision as to Beltchev's liability for aiding and abetting the alleged churning must await further development of the facts.
 
 
 52
 The complaint alleges that Beltchev was employed by appellees Moore & Schley (March 2, 1970 to December 8, 1971) and Hutchinson (December 8, 1971 to December 13, 1972) during the period of the alleged churning (October 1970 to September 1972). The possible liability of these two companies as controlling persons, 15 U.S.C. Sec. 78t(a), as principals under the common law of agency, or as both, Marbury Management, Inc. v. Kohn, 629 F.2d 705 (2d Cir.), cert. denied, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); Junger v. Hertz, Neumark & Warner, 426 F.2d 805, 807 (2d Cir.), cert. denied, 400 U.S. 880, 91 S.Ct. 125, 27 L.Ed.2d 118 (1970), must also await further factual development.
 
 
 53
 The allegations that appellee Shultes, the president of appellee Sheffield and an investment advisor to the Growth Companies between April 16, 1971 and August 13, 1973, "was aware" of and "approved" of the alleged churning do not state a cause of action for aiding and abetting. Unlike Beltchev who brokered the allegedly churned stock, Shultes, as president of Sheffield, advised the fund managers on the merits of investments. He also differed from Beltchev in that he was not a shareholder in any of the managing companies. Shultes cannot be held liable as an aider and abettor unless his financial advice was a proximate cause of the churning and the fund's resultant losses. Edwards & Hanly v. Wells Fargo Securities Clearance Corp., supra, 602 F.2d at 484. Moreover, a "but-for" concept of proximate cause will not satisfy this requirement. Id. In the absence of a claim that approval by Shultes was a prerequisite to the purchase or sale of stock, his advice could not even be considered a "but-for" form of proximate cause. The fund managers could have churned by following the advice of others or could have proceeded without any outside advice at all. Awareness and approval, standing alone, do not constitute substantial assistance.
 
 
 54
 Appellants' allegations that Arawak, its shareholders and officers, aided and abetted the alleged churning not only fail to state a cause of action, they also are insufficient to satisfy the requirements of Rule 9(b). Although Arawak, as trustee, had a fiduciary duty to the funds and the shareholders, its role was limited by the trust Deed to that of a depository for investments made by the funds and for cash received through the sale of securities. It had neither the power nor the duty to pass upon the merit or frequency of investments. In the absence of such a fiduciary duty, a failure to disclose churning activity would lead to liability only if the inaction was knowing and with conscious intent to aid the fraud. The complaint contains no such allegation. As part of the 1967 changes in the trust agreement, Arawak waived its security handling fee of one-quarter percent and thus had nothing to gain from the churning. Moreover, Arawak had no financial connection with New Providence. The complaint fails to specify in what manner Arawak associated itself with the churning venture, participated in the venture as something it wished to bring about and sought by its action to make the venture succeed. See IIT v. Cornfeld, supra, 619 F.2d at 925.
 
 
 55
 On April 7, 1971, the Bahamas Supreme Court relieved Arawak of its duties as trustee, and the major changes in the makeup and operation of the Funds occurred after that date. There are no allegations as to how much, if any, of the alleged churning occurred prior to April 7. Accordingly, appellants' allegations that the Arawak appellees took no steps to prevent churning and that Arawak resigned as trustee without informing shareholders of the churning are conclusory charges without factual support. See Decker v. Massey-Ferguson, Ltd., supra, 681 F.2d at 114, 116. Since Arawak and its officers cannot be held liable as aiders and abettors, the Arawak shareholders, Goldman, Sachs and Brown Brothers, cannot be held liable vicariously.
 
 The Custodian Banks
 
 56
 The district court held that the allegations that Fiduciary Trust Company and its vice-president Joseph Schwerin aided and abetted a fraudulent scheme engineered by McAlpin, Sion Plaza and New Providence by transferring funds at Sion Plaza's directions, does not meet the specificity requirements of Rule 9(b). We agree. The complaint alleges that the fraudulent scheme was intended "to loosen the control of Fiduciary over the assets and to enable certain of the defendants to loot those assets at a later date", and that this scheme was hidden by means of undescribed false statements and omissions. The complaint does not allege that Fiduciary was free to disobey the trustee's instructions or that it played any role in the unidentified false statements or omissions, and it fails to particularize adequately how and why Fiduciary should have anticipated that "certain of the defendants" would loot the assets at a later date.
 
 
 57
 The district court also held that the allegations against Bradford Trust Co. and its officers do not meet the specificity requirements of Rule 9(b). Again, we agree. Although the complaint alleges that most of the $2.2 million transferred out of the Bradford accounts was transferred to bank accounts of "persons and entities who were unrelated to the business of the Capital Growth Companies", it actually identifies the transferees of only $679,000 and fails to specify why even those transferees were not entitled to the funds transferred. Moreover, the complaint neither describes nor identifies any misleading statements or omissions, concerning these transfers that were attributable to the bank or of which the bank was aware. Conclusory allegations that the bank aided and abetted are not enough. Decker v. Massey-Ferguson, supra, 681 F.2d at 119.
 
 Redemption of Santa Elena Shares
 
 58
 The complaint alleges that this transaction involved a scheme engineered by McAlpin, New Providence, San Cristobal, Jose Figueres Ferrer and Santa Elena, Ltd. to defraud and to loot the assets of the Capital Growth Companies. This cause of action should have survived appellees' motion to dismiss. Although shareholders generally were precluded from redeeming their shares by the close-ending of the Growth Companies, the companies redeemed Santa Elena's shares for $2,000,000, of which $1.3 million was paid to San Cristobal. The $1.4 million advanced to Santa Elena is alleged to be in violation of the trust.
 
 
 59
 These acts are alleged to be part of the larger fraudulent scheme engineered by McAlpin and New Providence, which involved the transfer of Fund assets to newly-formed corporations and the close-ending of the new companies, all for the purpose of easing the task of looting the Growth Companies' assets. At the very outset of McAlpin's fraudulent mismanagement, he misrepresented what he was doing and what he intended to do with the Fund's assets, by stating that the investment policy of the Fund would remain the same and that the new procedure had been adopted "as a result of consultation with the Securities and Exchange Commission." The implication that McAlpin had SEC approval was both false and inescapable. McAlpin continued his misleading tactics when he later stated that he was changing the Fund from open-end to close-end and organizing the Costa Rican companies in order to reduce expenses, when his true purpose was to prevent shareholders from withdrawing from the funds he was looting.
 
 
 60
 The complaint alleges that McAlpin and New Providence also hid the true nature of the Santa Elena transactions from the Growth Companies' shareholders. As to the fraudulent conspiracy behind the Santa Elena transaction, which went far beyond internal corporate mismanagement, "disclosure or at least the absence of misleading disclosure [was] required." Goldberg v. Meridor, 567 F.2d 209, 221 (2d Cir.1977), cert. denied, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). Cf. Rodman v. Grant Foundation, 608 F.2d 64, 72-73 (2d Cir.1979).
 
 Leave to Replead
 
 61
 Because the complaint whose allegations were being considered by the district court was plaintiffs' second amended complaint, the district court did not abuse its discretion in refusing to give plaintiffs a fourth attempt to plead. Decker v. Massey-Ferguson, supra, 681 F.2d at 115.
 
 Disqualification of Counsel
 
 62
 In that portion of our 1980 en banc decision, 625 F.2d at 442-46, that was vacated by the Supreme Court, we affirmed Judge Werker's order which denied cross-appellants' motion to disqualify appellants' trial attorneys. Although McAlpin and Capital Growth Real Estate Fund, Inc. have now linked their appeal to appellants' appeal from the final judgment, our reversal and remand as to McAlpin return the disqualification issue to an interlocutory status. In any event, nothing has happened since our 1980 opinion that would impel us to overturn Judge Werker's order at the present time.
 
 Disposition
 
 63
 For the reasons above-stated, our disposition of the causes of action, entitled "First" through "Twentieth" is as follows:
 
 
 64
 First, Second, Third, Fifth, Eighth and Seventeenth: Dismissal affirmed.
 
 
 65
 Fourth: Dismissal of this cause of action against Beltchev and Hayden Stone which is based on alleged violation of the Investment Advisers Act, 15 U.S.C. Sec. 80b-1 et seq., is affirmed. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979).
 
 
 66
 Sixth: Dismissal of all charges relative to the 1969 purchase of EHG stock affirmed. Dismissal of the allegations concerning the 1972 sale of stock to Ariel Gutierrez affirmed for failure to allege any inadequacy of consideration.
 
 
 67
 Seventh: Dismissal as to Beltchev, Shultes and Sheffield affirmed. See Transamerica Mortgage Advisors, Inc. v. Lewis, supra.
 
 
 68
 Ninth, Tenth and Eleventh: Dismissal as to Arawak, Pringle, Rafferty, Goldman, Sachs, Brown Brothers, Shultes, and Sheffield affirmed. Dismissal as to McAlpin, New Providence, New Providence, S.A., Beltchev, Moore & Schley, and Hutchinson reversed and the matter remanded for further proceedings.
 
 
 69
 Twelfth: Dismissal of claim on behalf of Real Estate Fund affirmed. Dismissal of claim against Arawak, Pringle and Rafferty on behalf of Growth Fund affirmed. Dismissal of claim against McAlpin and New Providence on behalf of Growth Fund reversed and the matter remanded for further proceedings.
 
 
 70
 Thirteenth: Dismissal of this cause of action for alleged breach of fiduciary duties by Arawak, Pringle, and Rafferty affirmed. Although the allegations of this cause of action are most generalized and conclusory, we need not decide whether they state a cause of action. The district court did not abuse its discretion in dismissing this cause of action as a pendent claim based on State law. Nolan v. Meyer, 520 F.2d 1276, 1280 (2d Cir.), cert. denied, 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975).
 
 
 71
 Fourteenth: Dismissal as to Fiduciary and Schwerin affirmed. Dismissal as to McAlpin, New Providence, Sion Plaza and Antonio Pena Chavarria reversed and the matter remanded for further proceedings.
 
 
 72
 Fifteenth: Dismissal as to McAlpin and New Providence, the only defendants named in this cause of action, reversed and the matter remanded for further proceedings. Dismissal as to all other defendants whom appellants might have intended to include in the phrase "certain of the other defendants" affirmed.
 
 
 73
 Sixteenth: Dismissal as to Fiduciary and Schwerin affirmed.
 
 
 74
 Eighteenth: Dismissal as to Bradford, Schwerin and Shultes affirmed. Dismissal as to McAlpin and New Providence reversed and the matter remanded for further proceedings.
 
 
 75
 Nineteenth: Dismissal as to Bradford, Schwerin and Shultes affirmed.
 
 
 76
 Twentieth: Dismissal as to all defendants named therein reversed and the matter remanded for further proceedings.
 
 
 77
 In arriving at the foregoing holding, we have given no consideration to the claims of lack of jurisdiction that were raised but not passed on below. Moreover, as to those causes of action that we have reversed and remanded, we do not purport to hold or suggest that recovery by appellants must follow our remand. We merely hold that, as to the issues remanded, dismissal at this stage was improper.
 
 
 78
 For reasons also already expressed, the cross-appeal is dismissed.
 
 
 79
 Because of the diversified disposition we now make of the issues on appeal, costs of the appeal will not be awarded to any of the parties.
 
 
 
 *
 Of the Southern District of New York, sitting by designation