UNITED RESOURCES EQUITY PART-
NERS I, L.P., LIRO Group, L.P., and
United Resources Energy Partners Ser-
ies II, L.P., Plaintiffs,

v.

NATIONAL ENERGETICS COMPANY,
The Estate of E. Eugene Mahon,
Randall T. Boyd, Bruce C. Boyd, Owen
E. Boyd, Eugene P. Bergemann, John
W. Sim, and Frank P. Nagorney, Defen-
dants.

No. 92 Civ. 8994(CBM).

United States District Court,
S.D. New York.

Dec. 19, 1997.

Sussmane & Zapfel, P.C. by Kenneth Suss-
mane, New York City, for Plaintiffs.

Miner, Barnhill & Galland, P.C. by Charles
Barnhill, Jr., Madison, WI, for Defendants.

### MEMORANDUM OPINION

MOTLEY, District Judge.

Plaintiffs, United Resources Equity Part-
ners I, L.P., LIRO Group, L.P., and United
Resources Energy Partners Series II, L.P.,
allege that they were defrauded in their pur-
chase of National Energetics Company stock
under § 10(b) of the Securities Exchange Act
of 1934, 15 U.S.C. § 78j(b) and S.E.C. Rule
10B–5 promulgated thereunder, § 20(a) of
the Securities Exchange Act of 1934, 15
U.S.C. § 78t, § 12(2) of the Securities Act of
1933, 15 U.S.C. § 77 1(2), § 15 of the Securi-
ties Act of 1933, 15 U.S.C. § 77v, the Massa-
chusetts Securities Act, Mass.Gen.Laws Ann.
Chap. 110A, the Texas Securities Act, Tex.
Rev.Civ.Stat.Ann. Articles 579 et seq., Sec-
tion 27.01 of the Texas Bus. & Com.Code
Ann. (West 1987), and common law.

Defendants deny the allegation that they
materially misled plaintiffs in their purchase
of National Energetics Company stock. Ad-
ditionally, defendants argue that plaintiffs
case fails because plaintiffs have not met the

requirements of the applicable statute of limitations in this case.

A bench trial was held before the court on November 21, 22, 25 and 26, 1996. Based on the stipulations of facts between the parties, the trial testimony, and the exhibits, the court makes the following Findings of Facts and Conclusions of Law in favor of defendants.

## FINDINGS OF FACTS

### I. THE PARTIES

1. Plaintiffs, United Resources Equity Partners I, L.P., LIRO Group, L.P., and United Resources Energy Partners Series II, L.P., are all limited partnerships organized under the laws of the State of Delaware. Plaintiffs' managing general partner is United Resources Capital Management, Inc. (URCM), a corporation organized under the laws of the State of Delaware. Dennis M. Quirk is president and chief executive officer of URCM. Mr. Quirk formed the plaintiff partnerships for the purpose of investing in certain companies. (Tr. at 21–22).[1]

2. Defendant, National Energetics Company (NECO), is a corporation organized under the laws of the State of Delaware. The remaining defendants, Randall T. Boyd, Bruce C. Boyd, Owen E. Boyd, Eugene P. Bergemann, John W. Sim, Frank P. Nagorney, and the Estate of E. Eugene Mahon, are all individuals who were associated with NECO at various times.

### II. THE DISPUTE

3. In 1987, 1988 and 1989, NECO was marketing a process called "trigeneration", which was developed by Randall T. Boyd. Trigeneration is a process which extracts carbon dioxide from the waste gases of a cogenerator. (Tr. at 316–317, 341–342).

4. In 1987 and 1988, NECO attempted to sell its trigeneration process to potential buyers, including Coca–Cola and Anheuiser Busch. (Tr. at 353).

5. In June, 1989, NECO entered into a lease regarding a cogeneration facility in Bellingham, Massachusetts where NECO was to install its trigeneration processes. (Exhibit 1). Under the terms of the lease, NECO was primarily responsible for maintaining and operating the facility. The lease also gave NECO permission to sell resulting carbon dioxide to any purchaser. (Exhibits 1, 9, 11). The lease also stipulated that NECO was to enter into agreements for the sale of carbon dioxide in a manner often referred to as "milestones": 50 tons must be sold by September, 1989, 100 tons by December, 1989, 150 tons by March, 1990, etc. (Tr. at 73–74). Under the terms of the lease, if the milestones were not met the lease could be terminated. (Exhibit 1).

6. During this time, NECO was extensively researching the carbon dioxide market in the northeastern United States. (Tr. at 371).

7. Based on its research, NECO decided that it could sell all the carbon dioxide it could produce at the facility in Bellingham, (Tr. at 406), and that a reasonable price for the carbon dioxide would be $75/ton wholesale and $125/ton retail. (Tr. at 372).

8. During mid–1989, NECO arranged to sell 150 tons of carbon dioxide to American Carbonation, a company which distributed carbon dioxide. This arrangement covered the first three milestones outlined in the lease. (Tr. at 405–406, 408–409).

9. Towards the end of 1989, NECO investigated the possibility of a joint venture with Archer Daniels Midland ("ADM"), a strong competitor in the carbon dioxide industry. (Tr. at 408–410).

10. NECO had a competitive advantage over other large carbon dioxide producers because the Bellingham facility was the only large-scale carbon dioxide production facility in the northeast. (Tr. at 401).

11. Due to the progress of the discussions between NECO and ADM, defendants believed that NECO would be quite successful as of January 1, 1990, after plaintiffs had agreed to purchase NECO stock. (Tr. at 406–10).

12. In mid-January, 1990, NECO met with a company named IEC and the bank which was financing the Bellingham facility for

---

1. Unless otherwise noted, all references are to page numbers of the trial transcript.

IEC. (Tr. at 410–411). At this meeting, the bank told NECO for the first time that it would not allow IEC to accept the American Carbonation agreement. (Tr. at 411). However, the bank told NECO that the potential partnership between NECO and ADM was a good idea. (Tr. at 411). Additionally, at this meeting IEC told NECO that it would waive the milestones in the lease. (Tr. at 412–413).

13. In March, 1990, a board of directors meeting and a shareholders meeting were held. (Tr. at 413). At the shareholders meeting, which Mr. Quirk attended, it was announced that IEC had given NECO unwritten waivers for the milestones. (Tr. at 416–417).

14. IEC did not subsequently mention the milestones to NECO. (Tr. at 413). IEC never told NECO that NECO was in default of its lease due to failure to meet the milestones. (Tr. at 410).

15. In September, 1990, the dealings with ADM fell apart. (Tr. at 418–423). Subsequently, NECO entered into an amended lease which substituted a $100,000 annual payment for NECO's right to sell the carbon dioxide. (Tr. at 426–427; Exhibit 8).

16. Thereafter, NECO tried to arrange other projects, but none of them worked out due to continued delays at the Bellingham facility. (Tr. at 427–429). At this point, NECO was short on cash and sought other investors without much success. (Tr. at 214–215, 428–430). In 1991, NECO sold the carbon dioxide that it produced at the Bellingham facility before the facility was officially certified, as it was entitled to do under its lease. (Tr. at 428). Also, Lee Cotten loaned NECO $200,000. (Tr. at 429). Mr. Cotten subsequently agreed to invest money in NECO, if the shareholders would agree to restructure the company's equity in exchange. (Tr. at 429). All of the shareholders agreed, except for Mr. Quirk. Thereafter, NECO was sold at auction to Mr. Cotten, and then ceased to function. (Tr. at 429–430).

17. In 1989, Mr. Quirk was a registered investment advisor who represented partnerships about potential investments. (Tr. at 21, 137).

18. Mr. Quirk investigated NECO for about a year, starting in early 1989. Throughout the year he met with defendants, received documents dealing with NECO's potential future business, and received some of NECO's internal income projections. (Tr. at 23, 34, 141–142, 144). Mr. Quirk invested in NECO for plaintiffs in late December, 1989. When he invested, Mr. Quirk signed a stock purchase agreement (Tr. at 434; Exhibit 1) in which he warranted that, among other things, he has "evaluated the investment" and understands that the investment "involves a high degree of financial risk." (Tr. at 152; Exhibit 1).

19. Mr. Quirk was present at the shareholder's meeting in March, 1990, at which it was announced that NECO had obtained unwritten waivers for the milestones. (Tr. at 416–417). Afterwards, Mr. Quirk was informed that the negotiations with ADM had fallen apart. (Tr. at 425). Mr. Quirk was active in NECO's business and often commented on NECO's management. (Tr. at 238).

## CONCLUSIONS OF LAW

20. The applicable statute of limitations is contained in Section 13 of the Securities Act of 1933 ("1933 Act"). Section 13 states, in relevant part, as follows:

"No action shall be maintained to enforce any liability created under section 11 or section 12(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence ..."

■ This standard, besides being applicable to claims brought under section 12(2) of the 1933 Act, is also applicable to claims brought under section 10(b) of the Securities Exchange Act of 1934. *See Komanoff v. Mabon, Nugent & Co.,* 884 F.Supp. 848 (S.D.N.Y.1995). Thus, a plaintiff should file her claim within one year of the date upon which alleged untrue statements or omissions are discovered or should have been discovered. *See Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983); *Bresson v. Thomson McKinnon Sec., Inc.,* 641 F.Supp. 338, 345 (S.D.N.Y.1986).

21. Plaintiffs in this case do not meet the requirements of Section 13. Assuming that defendants materially misled the plaintiffs in connection with plaintiffs purchase of NECO stock, plaintiffs should have discovered the deception in 1990, well over a year before plaintiffs filed this action. Mr. Quirk became a member of the board of directors of NECO on March 19, 1990. From that point forward, Mr. Quirk had access to all of NECO's documents. Also, Mr. Quirk attended a shareholder's meeting on March 19, 1990, at which it was announced that NECO had obtained unwritten waivers of the milestone dates. Thus, Mr. Quirk should have discovered the facts which allegedly prove fraud at this time.

22. Additionally, throughout 1990 and 1991, Mr. Quirk attended board of directors meetings and should have learned about NECO's dealings at these times. For example, Mr. Quirk was informed about the botched negotiations with ADM in late 1990. Also, in mid–1991, Mr. Quirk was sent information showing that NECO would only receive a flat fee of $100,000 from the project at the Bellingham facility. Thus, Mr. Quirk should have known that the projections he was given about NECO before he invested in the company were not being realized.

23. Mr. Quirk was a professional investor. When he invested in NECO in late 1989, he signed a stock purchase agreement in which he acknowledged that this was a high-risk investment. Paragraph 6 of the agreement, in relevant part, stated:

"(d) Investor has such knowledge and experience in financial and business matters as to enable Investor to evaluate and Investor has evaluated the investment in the Investor Stock and understands the investment being made is speculative and thus involves a high degree of financial risk. (e) Investor is able to bear the economic risk of investment in the Investor Stock including the risk of losing part or all of Investor's investment." (Tr. at 152; Exhibit 1).

Thus, Mr. Quirk was aware of the fact that his investment in NECO was speculative and financially risky. Mr. Quirk must now abide by the terms of the agreement which he signed.

24. Vague statements about future projections are not actionable as they are mere "puffery." See Lasker v. N.Y. State Elec. & Gas Corp., 85 F.3d 55 (2d Cir.1996); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Co., Inc., 75 F.3d 801, 811 (2d Cir.1996). Plaintiffs allege that they received materially misleading income projections and heard materially misleading claims about NECO's ability to meet the terms of its lease in the future. However, such future projections about NECO's expected performance are not actionable under the federal securities laws. Furthermore, paragraph 6 of the stock purchase agreement which Mr. Quirk signed stated, in relevant part, as follows:

"(f) Except for those matters set forth in each of the Exhibits attached hereto, no officer, agent, director or any other person associated with the Company has made any oral or written guaranty or representation upon which Investor has relied concerning the possibility or probability of profit or loss as a result of Investor's investment." (Tr. at 153; Exhibit 1).

Thus, plaintiffs cannot claim that they were misled by their reliance on the income projections, nor by their reliance on statements made by the defendants, since these projections and statements were not set forth in the purchase agreement.

SO ORDERED.

