**Julia M. RUIZ, Plaintiff,**

v.

**CHARLES SCHWAB & CO., INC. and Jeff Peskin, Defendants.**

**No. 88 Civ. 1747.**

United States District Court,
S.D. New York.

Jan. 2, 1990.

Siller, Wilk, Mencher & Simkin, New York City (Allen Reiter, of counsel), for defendant Jeff Peskin.

## MEMORANDUM & ORDER

OWEN, District Judge:

Plaintiff Julia Ruiz seeks recovery from defendants Charles Schwab & Co., Inc. ("Schwab") and Jeff Peskin for alleged fraud and violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). Defendants now move for summary judgment.

Ruiz opened an account with Schwab in 1986. Shortly thereafter, while in Schwab's offices, Ruiz asked a Schwab registered representative, George Osorio, to recommend an investment advisor. Since Schwab is a discount brokerage firm, it neither employs investment advisors nor allows employees to recommend them to Schwab clients. Ruiz alleges that Osorio nonetheless referred Ruiz to Peskin, who was standing nearby at the time.[1] Although Peskin is not a Schwab employee, Peskin and many others who transact business through Schwab receive "VIP status" from Schwab based upon the amount of commissions they generate. Peskin therefore could and did use Schwab's VIP Lounge, which was inaccessible to the general public.[2] In his conversations with Ruiz, Peskin referred to the lounge as "his office;" the Schwab switchboard accepted telephone calls for Peskin, transferring them to the VIP lounge.

Some time after she met Peskin, Ruiz signed a limited power of attorney ("LPOA") that enabled Peskin to trade on her behalf in her Schwab account.[3] Al-

Lunney & Crocco, New York City (Charles A. Crocco and Andrew P. Saulitis, of counsel), for plaintiff Julia M. Ruiz.

Daniel J. Brooks, New York City, for defendant Charles Schwab & Co., Inc.

1. Ruiz describes the encounter as follows: Ruiz asked Osorio "if he knew somebody that could advise me with my account. Then he said, 'Well, I know somebody that might help you,' and then this Mr. Peskin was coming, going inside the office, and [Osorio] called, 'Hey'—I don't talk that way—'Hey, Peskin come here. There is this lady; maybe you can help her.' I had my account [statement] with me and I showed it to Mr. Peskin, you know, and that's the way I met Mr. Peskin." Transcript of Ruiz Deposition at 130.

2. According to Schwab, the VIP Lounge at the Madison Avenue branch frequented by Ruiz could accommodate approximately eight people, and it contained easy chairs, a Quotron machine and a telephone, but no desk or sign. In late July or early August of 1987, Schwab converted the VIP Lounge into an office for Schwab's assistant branch manager.

3. Although Schwab had the ability to refuse LPOA authorization, once it accepted Peskin as Ruiz's agent, it had no power to control or influence Peskin's trading or to veto specific trades if those trades were of a type authorized to take place in the account.

though Peskin never explicitly represented himself as a Schwab employee, and the LPOA explicitly stated that Peskin was not a Schwab employee,[4] Ruiz nonetheless claims that she did not read the form she signed and continued to think that Peskin was a Schwab employee.

Ruiz now sues Peskin for alleged acts of "churning"[5] and fraudulent statements and omissions related to Peskin's options trading in Ruiz's account at Schwab.[6] Ruiz seeks to impose derivative liability on Schwab. Ruiz suffered a $200,000 loss on the options as a result of the October, 1987, stock market crash.[7]

### PESKIN'S LIABILITY

■ An investment advisor, as well as a broker-dealer, can be liable for churning under § 10(b) of the Securities Exchange Act of 1934. *Armstrong v. McAlpin,* 699 F.2d 79 (2d Cir.1983). Although Peskin and Ruiz dispute the turnover rate in Ruiz's account, Ruiz has demonstrated a genuine question of material fact as to whether Peskin's trading volume constituted unlawful churning in light of Ruiz's investment objectives.

■ Similarly, although Peskin claims that he received no commissions for his activities on Ruiz's behalf, proof of commissions is unnecessary for establishing churning liability. *See Kaufman v. Merrill Lynch, Pierce, Fenner & Smith,* 464 F.Supp. 528, 535 (D.Md.1978). Moreover,

Ruiz has demonstrated that Peskin received a number of indirect benefits from Schwab due to the volume he generated. For example, Schwab gave Peskin reduced commission rates for his own account based upon his overall volume of trading in any accounts he controlled. Furthermore, Peskin received the benefits associated with continued VIP status so long as he maintained an active trading volume.

With regard to Ruiz's fraud allegations, the parties dispute the amount of information Peskin provided Ruiz with regard to the risks of options trading, thereby making summary judgment inappropriate on this record.

### SCHWAB'S LIABILITY

■ Ruiz asserts three theories under which Schwab is liable derivatively for Peskin's alleged churning and misrepresentations. The first is that Schwab by its conduct bears liability for permitting Peskin to appear to be acting for it, that is, apparent authority. Since the doctrine of apparent authority applies when the principal's own conduct contributes to the agent's ability to mislead, *General Overseas Films Ltd. v. Robin Intern., Inc.,* 542 F.Supp. 684, 689 (S.D.N.Y.1982), *aff'd,* 718 F.2d 1085 (2d Cir. 1983), the critical inquiry is whether Schwab's conduct permitted Ruiz actually and reasonably to believe that Peskin was authorized by Schwab. *See Bernstein v.*

---

4. The LPOA reads, in pertinent part: "I understand that Schwab is not affiliated with and does not endorse or recommend Agent, that Schwab will not assist in or review Agent's trading decisions, or supervise or monitor Agent's trading in my account."

5. "Churning" occurs when a trader causes an excessive turnover rate in a customer's account in order to increase the trader's commissions. *See Armstrong v. McAlpin,* 699 F.2d 79, 90 (2d Cir.1983). Churning is a deceptive device actionable under section 10(b) of the Securities Exchange Act of 1934. *Id.* at 91.

6. In addition to the LPOA enabling Peskin to trade in her Schwab account, Ruiz signed a form that gave Peskin the authority to trade in options on her behalf, as well as separate Schwab Applications to Add Options to a Brokerage Account and Options Financial Questionnaires. The Options Account Agreement Ruiz

signed provides: "I represent that I am aware of the inherent risks of options trading and that I am financially able to bear such risks and withstand options trading losses." Ruiz says, however, that she was unfamiliar with options and that she did not understand the forms she signed. She alleges that although she sought safe investment outlets such as Treasury Bills, Peskin traded in options on her behalf, using her Treasury Bills as collateral. When the market collapsed in October, 1987, Ruiz's account was heavily extended, and the Treasury Bills went to pay the margin calls.

7. Not all of Ruiz's losses are necessarily attributable to the market drop. Schwab liquidated Ruiz's account after the collapse pursuant to instructions from Mr. Lanardone, an employee of Ruiz's estranged husband.

*Centaur Ins. Co.*, 644 F.Supp. 1361 (S.D.N.Y.1986).

Although a number of equivocal circumstances support Ruiz's belief, Schwab in the LPOA did provide Ruiz with information that set forth unequivocally that Peskin was not a Schwab employee. Ruiz's neglect in not reading the LPOA that she signed does not constitute conduct on the part of Schwab. Furthermore, even if Peskin did have apparent authority prior to Ruiz's receipt of the LPOA form, her act of signing that form put her on notice that such apparent authority had been terminated.

◼ Second, Ruiz claims controlling person liability as to Schwab under section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t.[8] This requires a showing that the alleged controlling person was a culpable participant in the activities of the controlled person whose conduct is claimed to violate the securities laws. *See Gordon v. Burr*, 506 F.2d 1080 (2d Cir. 1974). Furthermore, in order to be considered a controlling person, Schwab must have had "some indirect means of discipline or influence short of actual direction ... and the failure of the controlling person to diligently enforce a proper system of internal supervision may be sufficient for liability," *Kaufman v. Merrill Lynch, Pierce, Fenner & Smith*, 464 F.Supp. 528, 538 (D.Md.1978).

With regard to Ruiz's churning claim, Schwab's influence over Peskin and its arguable culpability therefore is a genuine issue of material fact still in dispute. *See Kaufman*, 464 F.Supp. 528. The execution of a limited power of attorney does not relieve Schwab of all of its responsibilities to investors. *See id.* Since Schwab supervisors monitored the volume and commissions on customer accounts, it is possible that Schwab would or should have been aware of any unlawful churning in Ruiz's account. *See Kaufman*, 464 F.Supp. at 534–35.[9]

◼ Finally, Ruiz seeks to hold Schwab liable as an aider or abettor of Peskin. Three elements are necessary to establish such liability: 1) a violation by a primary wrongdoer, 2) knowledge by the alleged abettor, 3) proof that the abettor substantially assisted in the wrongdoing. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Second Circuit authority holds that the knowledge requirement is satisfied if the alleged aider and abettor recklessly disregarded the facts. *See id.* at 91. However, such liability does not apply to "a broker-dealer who merely executes orders for 'unsuitable' securities made by an investment advisor vested with sole discretionary authority to control the account." *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir.1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698. Likewise, inaction ordinarily does not constitute substantial assistance, "except when it was designed to aid the primary fraud or it was in conscious and reckless violation of a duty to act." *Armstrong*, 699 F.2d at 91 (citation omitted).

The fiduciary duty of a broker to a customer is a factual question, *see Kaufman*, 464 F.Supp. at 536. Given Schwab's monitoring of the trading volume in customer accounts, a material question exists as to whether Schwab's inaction in this limited area was in reckless disregard of a duty to act. *See Nelson v. Hench*, 428 F.Supp. 411 (D.Minn.1977).

---

8. Section 78t(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

9. It is not clear to what extent, if significant at all, Ruiz's damages were caused by churning, which Schwab on a fuller record may be shown to bear responsibility for. What appears more likely is that her losses were caused by Peskin investing her money in options pursuant to her written agreement, which Schwab would have had no right to question, *see Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir. 1978), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698.

Accordingly, Peskin's motion for summary judgment is denied, and Schwab's motion for summary judgment is granted except as to the limited issue delineated in the preceding paragraph of this memorandum, as to which it is denied.

So ordered.