**John A. HEALEY, Plaintiff,**

v.

**CHELSEA RESOURCES LTD., Dominick & Dominick Securities, Inc. and Dominick & Dominick, Inc., Defendants.**

**No. 88 Civ. 6957 (RLC).**

United States District Court, S.D. New York.

April 24, 1990.

Whitman & Ransom, New York City (Michael S. Press, Michael G. Carey, Philip M. Smith, of counsel), for plaintiff.

Cadwalader, Wickersham & Taft, New York City (Gregory M. Petrick, of counsel) for defendants Dominick & Dominick Securities, Inc. and Dominick & Dominick, Inc.

ROBERT L. CARTER, District Judge.

"O accurst craving for gold."

—Virgil, *Aeneid*, Bk. III, 1. 57

This case arises out of an ill-fated attempt to resurrect a historical Montana gold mine, the Spotted Horse. Investor-turned-plaintiff John A. Healey alleges violations of § 12(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77*l* (2), § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, C.F.R. § 240.10b–5, common law fraud and negligent misrepresentation, and seeks rescission, damages, and punitive damages. Discovery in this case is complete and defendants Dominick & Dominick Securities, Inc. ("Dominick Canada"), a Canadian corporation, and Dominick & Dominick, Inc. ("Dominick U.S."), a United States corporation, now move for summary judgment against plaintiff pursuant to Rule 56, F.R. Civ.P.[1]

## I.

The Spotted Horse is located in Fergus County, Montana, near the town of Lewiston, and has a past history nearly as tumultuous as its present.[2] It was discovered in 1881, and, apparently between 1884 and 1894, was a successful and productive gold mine with a mill to treat the ore on premises.[3] Beginning in 1895, the mine went through an unstable period and changed hands eight times in seven years, often through foreclosure. In 1902, the

mill burned down and the mine was closed until 1910, at which time further production was attempted. The Spotted Horse was abandoned in 1935.

In 1968, the Blue Range Mining Company acquired the Spotted Horse from a Lewiston bank and began rehabilitation. In 1972, Viking, a company engaged in mining activity, acquired an option on the Spotted Horse and, in conjunction with its partner Johns Manville Corporation, made considerable improvements to the mine. After Johns Manville Corporation's withdrawal from the project, Viking entered into an operating agreement with another corporation, but eventually went into bankruptcy. In 1982, Cimmarron Exploration Inc. acquired the rights to the Spotted Horse, and in 1985, entered into an agreement with Chelsea Resources Ltd. ("Chelsea"), a publicly traded Canadian company, whereby Chelsea would develop and finance production at the mine, and in return receive a share of the profits pursuant to an agreed upon formula.

Shortly after acquiring an interest in the mine, Chelsea commissioned Neil D.S. Westoll & Associates Ltd., under the direction of Dr. Neil D.S. Westoll, to prepare a report on the Spotted Horse (the "Westoll Report"). This forty page report which was released in November, 1986, covers the history, geology, and operation of the mine, sets forth a recommended exploration program and budget, and gives estimates on the amount of gold to be mined and its value after deduction of production costs. Dr. Westoll certified that the report was the result of his personal professional judgement and that he did not own or expect to receive any interest in the Spotted Horse or Chelsea.

In the Spring of 1987, Robert C. Wong, Vice–Chairman and a director of Dominick

1. Defendant Chelsea Resources Ltd. does not join the other defendants in this motion.

2. In accordance with the standard for determining summary judgment motions, all facts are viewed in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1987).

3. All historical information about the Spotted Horse is taken from "Report on the Spotted Horse Property Fergus County Montana, U.S. for Chelsea Resources Ltd.," November 20, 1986, prepared by Neil D.S. Westoll & Associates Ltd. *See infra* at 489.

Canada, became familiar with Chelsea and the Spotted Horse. In June, 1987, Wong visited the Spotted Horse, and met with Westoll and various Chelsea executives. Thereafter, Wong prepared a four-page report (the "Wong Report") for distribution to his retail clients consisting of three pages of text and a one page projection of profits and losses. The Wong Report's conclusion was that "[a]t current market prices, the common shares of Chelsea Resources Ltd. appear to be significantly undervalued and are strongly recommended for investors seeking a substantial capital gains opportunity in a rapidly developing, junior gold company...."

By August, 1987, Chelsea needed additional capital to carry out its business plan for the Spotted Horse. After attempting unsuccessfully to secure investment from other sources, it contacted Anthony Field, a Dominick Canada Vice–President,[4] and on August 21, 1987, contracted with Dominick Canada to be the exclusive agent for a private placement of Chelsea securities. Under the agreement, Dominick Canada had exclusive agency for 21 days to place privately 500,000 units of Chelsea securities at $3.25 (Cdn.) per unit. Each unit consisted of one common share of Chelsea and one common share purchase warrant exercisable within one year at $3.50 (Cdn.). The agreement provided that Chelsea would pay Dominick Canada's legal and accountancy charges incurred in the placement, and that Chelsea would make available full and complete disclosure of all material facts and give Dominick Canada access to all corporate and operating records.

Chelsea represented to Dominick Canada that it needed the money to pay a debt of approximately $1.6 million (Cdn.) to Newfields Minerals, a Canadian corporation engaged in gold mining exploration and development, to pay some debts to the Clark family, directors and controlling shareholders of Newfields Minerals, to pay some other small debts, and to finish the mill and the mine. At this time, Chelsea estimated that it needed to spend approximately $600,000 to $700,000 on the Spotted Horse to put it in operation. Apparently unable to wait for the Dominick Canada private placement to be finished, Chelsea obtained a short-term loan for $1,075,000 (Cdn.) on September 8, 1987, from a group of investors to whom it paid a substantial interest rate.

On September 11, 1987, Field called plaintiff at his home in New York in an attempt to sell him some units of the Chelsea private placement. Plaintiff is a successful professional investor who invests in and provides professional financial consultations to resource companies, including gold mining operations. Field had received plaintiff's name from a mutual acquaintance and knew that he had previously invested in ventures similar to the Spotted Horse.

The initial telephone conversation between plaintiff and Field was fairly short. Field outlined the basic terms of the placement, went over highlights of the Wong and Westoll reports, emphasized that the Westoll report was made by a qualified independent geologist, and stated that the mine would be in production any day, producing a very high grade of gold. The day after the first phone conversation, plaintiff received a packet from Field containing the Wong report, Chelsea's 1986 Annual report, two Chelsea press releases and three status reports on the Spotted Horse. Also included in this packet was a summary of the offering, prepared by Dominick Canada, which stated that the purpose of the money was to "repay loans to Newfields Minerals Inc. and related parties." Some of the materials received by plaintiff suggest that the mill and mine are, or are nearly, complete, and that production could begin at any time. The Westoll report arrived separately a day or two later, and Healey telephoned Westoll and discussed it with him personally.

Over the next day or two, plaintiff and Field had a couple of very short telephone

---

**4.** Robert C. Wong, Vice–Chairman and author of the Wong Report, was no longer with Dominick Canada by this time.

conversations for the purpose of arranging a meeting which took place on September 14, 1987, at the Toronto airport. At this meeting, which was less than an hour in length, Field gave plaintiff written projections of profit and loss, cash flow, and operating costs and expenses for the Spotted Horse. Field also offered to set up a meeting between plaintiff and senior Chelsea management, and such meeting took place on September 18, 1987, between plaintiff and Brian McAlister, President of Chelsea, and Michael Scholz, Chelsea's solicitor. At this meeting, McAlister provided plaintiff with a handwritten report of Chelsea's cash position as of September 30, 1987, showing a surplus of almost one million dollars.

By October 6, 1987, plaintiff apparently was seriously contemplating a sizable investment in Chelsea, and on this date met with McAlister, Fernando Nuflo–Moya, Chairman of the Board of Chelsea, and Westoll. The topic of this meeting was a large proposed investment in Chelsea by a third company, City Resources Ltd. Healey was against the proposed investment by City Resources Ltd. because it would dilute his proposed investment and he made a number of other suggestions for Chelsea to raise more cash. Plaintiff introduced a number of other investors to Chelsea, but none of the introductions culminated in any investment. On October 13, 1987, plaintiff purchased 500,000 units for $1,625,000 (Cdn.), and on October 14, 1987, was invited to join the Chelsea's board of directors and attended his first board meeting.

At the December 9, 1987 board meeting, plaintiff first learned that accounts payable and employee withholding taxes had not been paid, and that the Spotted Horse had not been fully winterized. By this time plaintiff suspected that he did not know Chelsea's true financial picture and expressed concern that the board was receiving inadequate financial information.

Plaintiff's concern was apparently well founded. Beginning in late 1987, Chelsea's problems worsened and it struggled to stay afloat. The Spotted Horse began having production problems in mid-December due to freezing weather conditions and the unwinterized state of the facility. Lack of funds continued to plague Chelsea but in February it managed to secure a $2,520,000 (Cdn.) investment from Northgate Exploration Ltd. Despite this investment, Chelsea's finances continued to deteriorate and, in April, its bank refused to extend any further credit.

On May 18, 1988, plaintiff resigned from the board and commenced this action on September 29, 1988.

## II.

Rule 56(c), F.R.Civ.P., provides for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis original). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* What is material, of course, is determined by the relevant substantive law applicable to the case at hand. Needless to say, factual disputes as to irrelevant matters do not preclude summary judgment.

To avoid summary judgment, the nonmoving party is required to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Although a party opposing summary judgment need not prove its evidence in a form admissible at trial or under the evidentiary standard which will be required, it must show facts sufficient to enable a reasonable mind to conclude that a material dispute of fact

exists. *Anderson v. Liberty Lobby Inc., supra,* 477 U.S. at 250–251, 106 S.Ct. at 2511–12.

### III.

Plaintiff rests his federal securities law claims on § 12(2) of the 1933 Act, § 10(b) of the 1934 Act, and Rule 10b–5.[5] To recover under § 12(2), plaintiff must show that "the defendant misrepresented or omitted a material fact and the plaintiff had no knowledge of the untruth or omission." *Mayer v. Oil Field Systems Corp.,* 803 F.2d 749, 755 (2d Cir.1986). To recover under § 10(b), plaintiff must show that "the defendant misrepresented or omitted a material fact and the plaintiff had no knowledge of that fact." *Id.* A fact is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Additionally, plaintiff's § 10(b) claim requires a showing of scienter on the part of defendants. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1380, 47 L.Ed.2d 668 (1976). Either intent or recklessness is sufficient to show scienter. *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.1982).

### A.

■ Plaintiff first complains that Dominick Canada falsely represented that Westoll was an independent geologist when in fact he was not independent of Chelsea.

■ The facts before the court are sufficient to show a genuine dispute regarding the independence of Westoll, and therefore summary judgment is precluded.[6] Although Westoll certified in signing the Westoll Report that he was independent and did not have a legal or beneficial interest in Chelsea, plaintiff has produced sufficient evidence to put Westoll's independence in question.[7] In a statement issued

---

**5.** Section 12(2) of the 1933 Act imposes civil liability on:

[a]ny person who ... offers or sells a security ... by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission....

15 U.S.C. § 77*l*(2) (1981).

Section 10(b) of the 1934 Act provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

... (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1981).

Rule 10b–5 provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1986).

**6.** Defendants' argument that much of the evidence put forward by plaintiff would be inadmissible at trial does not preclude the court's consideration of it here. As indicated *supra* at 491, it is not necessary to produce evidence in a form admissible at trial to avoid summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

**7.** Plaintiff, in his Memorandum of Law in Opposition to the Motion for Summary Judgment at 46, discusses a memorandum from Chelsea's mining engineer which allegedly supports the contention that Westoll was not independent. Although plaintiff lists this memorandum as Tri-

by Chelsea, Westoll was described as Chelsea's "Chief Geologist," a title which comports with the evidence suggesting that Westoll was a de facto, if not an official, part of Chelsea's management team. Westoll was Chelsea's representative on the Spotted Horse Management committee, and did on-going management work on site at the Spotted Horse. Additionally, Westoll had a financial interest in the success of the Spotted Horse. Chelsea owed Westoll a fairly significant amount of money which had not yet been paid for services he had performed. There was also some testimony that Westoll may have received shares of Chelsea stock as partial compensation for his work, although the exact time at which this occurred is not clear. In sum, there is evidence that the Westoll–Chelsea relationship went beyond simply hiring a geologist to make an independent appraisal.

The independence of Westoll is unquestionably material. The Westoll Report opines on a subject which necessarily cannot be predicted with certainty, and therefore the source of the report is of great importance in determining the weight to give it. Although there is no indication that the Westoll Report contains anything other than Westoll's best professional judgment, a reasonable investor nevertheless would want to know of the close ties to the company which Westoll is alleged to have had. Even though plaintiff has acknowledged that he does not believe the Westoll Report is incorrect or made in bad faith, it nevertheless remains that he would have viewed the opinion much more skeptically had he known of the relationship between Westoll and Chelsea.

### B.

Plaintiff also complains that Dominick Canada gave him false assurances that it had undertaken a careful and thorough review of Chelsea's business and finances when in fact it had not. Although Dominick Canada claims that it told plaintiff that it had not conducted any independent research, plaintiff claims that Dominick Canada represented that it had undertaken an independent review of the material it gave to plaintiff. Any claims which Dominick Canada may have made regarding independent verification of the available information are material and, because the existence of these claims is disputed, must be resolved at trial.[8]

■ Defendants correctly point out that plaintiff was a sophisticated investor who also did research into Chelsea and the Spotted Horse, including review of available financial information, review of the Westoll Report and meetings with various Chelsea executives. This, however, is beside the point. Plaintiff's own investigation does not render any false claims made by Dominick Canada unactionable unless plaintiff's research gave him actual knowledge that such claims were in fact false.

### C.

Plaintiff next complains that Dominick Canada falsely represented that the proceeds of plaintiff's investment would be used to repay loans to Newfields Minerals and certain related parties when in fact the money was used for other purposes. The document titled "Summary of the Offering" which was prepared by Dominick Canada and given to plaintiff, states that money raised by the private placement will be used to "repay loans to Newfields Minerals Inc. and related parties." Additionally, plaintiff has testified that he was also given this information orally and was told that the "related parties" were members of the Clark family.[9]

Although defendants deny misleading plaintiff regarding the planned use of his investment, in fact the "related parties" turned out to be a group of people, some

---

al Exhibit 39, it was not included in plaintiff's submission to the court and therefore the court places no reliance on it in making its determination.

**8.** The court does not address the degree of investigation which should have been performed by Dominick Canada.

**9.** Dan Clark was the former Chairman of Chelsea.

related to the President of Chelsea, Brian McAlister, who had made a series of high interest, short-term loans to Chelsea to enable it to stay afloat. Additionally, there is some evidence that Dominick Canada knew, but did not disclose, that Chelsea intended to use some of the money raised by the private placement to finish the mill and mine, even though defendants allegedly had claimed that the facility was already completed.

### D.

■ Plaintiff has testified that Dominick Canada represented explicitly and implicitly that all necessary work at the mine and mill had been or would be completed shortly, and that the mine and mill were capable of starting and sustaining full-scale commercial production. There is some evidence that Dominick Canada knew that the Spotted Horse was not completed at the time plaintiff made his investment, and, indeed, could not be completed until more money was received.[10] Additionally, plaintiff has pointed to certain of Chelsea's press releases which suggest that the Spotted Horse could begin production at almost any time.

Plaintiff has also testified that he had no knowledge and was never told that the Spotted Horse was not winterized.[11] It appears from the testimony that plaintiff never asked whether the Spotted Horse was winterized and that no one ever volunteered the information. Despite plaintiff's lack of inquiry, the fact that the mine and mill could not operate during a portion of the year is clearly a material fact which should have been disclosed.[12]

### IV.

Defendants have also moved for summary judgment on plaintiff's state law claims. For substantially the same reasons that summary judgment is inappropriate on the securities claims—disputed factual issues which cannot be resolved without a trial—it is also inappropriate on the state law claims.

### V.

■ Defendants have also moved for the dismissal of Dominick U.S. from this suit on the ground that it had no involvement in the Chelsea private placement or business of Dominick Canada. Plaintiff argues, however, that Dominick U.S. was a "controlling person" of Dominick Canada under § 15 of the 1933 Act and § 20(a) of the 1934 Act and therefore is appropriately named in this case.[13] There is no dispute

---

10. Defendants' argument that they should be excused from liability because they had extended an invitation to plaintiff to visit the mine before making his investment is unpersuasive. Although it may be true that had plaintiff visited the mine he would have discovered it was not completed, an invitation to discover misrepresentations or omissions does not shield the responsible party from liability. Likewise, defendants' arguments based on plaintiff joining Chelsea's board of directors after his investment are beside the point. The issue is the information given to plaintiff prior to his investment, not the information he may have discovered afterward.

11. Due to the Montana climate, the Spotted Horse could not operate on a year round basis unless it was winterized.

12. In addition to those discussed, plaintiff complains of other material misrepresentations and omissions. Because the above discussion demonstrates that summary judgment cannot be granted in this case, it is unnecessary for the court to address the rest of plaintiff's claims.

13. Section 15 of the 1933 Act provides:
Every person who, by or through stock ownership, agency or otherwise, or who pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge or of reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
15 U.S.C. § 77*o* (1981).
Section 20(a) of the 1934 Act provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did

that Dominick U.S. is the sole shareholder of Dominick Canada.

There has been disagreement and, to some extent, confusion in this circuit regarding the necessary allegations and the burden of proof for controlling person liability.[14] Some district courts have required the plaintiff to allege and prove culpable participation, *Ruiz v. Charles Schwab & Co.*, 736 F.Supp. 461, 464 (S.D.N.Y.1990) (Owen, J.); *Index Fund, Inc. v. Hagopian*, 609 F.Supp. 499, 506 (S.D.N.Y.1985) (Tenney, J.); *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.*, 529 F.Supp. 1179, 1194–95 (S.D.N.Y.1981) (Lasker, J.),[15] while other district courts have only required that the plaintiff allege and prove control, leaving it to the defendant to plead and prove good faith and lack of participation. *In re Citisource, Inc. Securities Litigation*, 694 F.Supp. 1069, 1076–77 (S.D.N.Y.1988) (Goettel, J.); *Terra Resources I v. Burgin*, 664 F.Supp. 82, 88 (S.D.N.Y.1987) (Sweet, J.); *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 884–885 (S.D.N.Y.1986) (Haight, J.); *Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1242 (S.D.N.Y.1981) (Ward, J.).[16]

Although the position of the Second Circuit on this issue is not entirely clear, it appears to this court that the Second Circuit at one time required the plaintiff to allege and prove culpable participation, *Gordon v. Burr*, 506 F.2d 1080, 1086 (2d Cir.1974), but now only requires that the plaintiff allege and prove control, leaving it to the defendant to plead and prove good faith and lack of participation.[17] *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. denied sub nom. Wood Walker & Co. v. Marbury Management, Inc.*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). This interpretation comports with a plain reading of the statutes as well as established principles of pleading which do not require that a plaintiff anticipate and negate a defendant's good faith defense. *See Terra Resources I, supra,* 664 F.Supp. at 88.

## VI.

In conclusion, disputed issues of fact which are relevant and material to the case preclude summary judgement on any of the claims. Dominick U.S. is appropriately named as a party to this action. Accord-

not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a) (1981). Although § 20(a) and § 15 are not identical, for the purpose of addressing defendants' motion they can be dealt with as one.

**14.** Nor is the case law of this circuit unique in this regard. A district court in the Third Circuit has described the case law construing § 20(a) as "at best ambiguous and at worst a mess." *Sharp v. Coopers & Lybrand*, 457 F.Supp. 879, 893 (E.D.Pa.1978).

**15.** Contrary to defendants' assertions, neither *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 884–85 (S.D.N.Y.1986) (Haight, J.) nor *Savino v. E.F. Hutton & Co., Inc.*, 507 F.Supp. 1225, 1242–44 (S.D.N.Y.1981) (Ward, J.), supports their position that culpable participation must be alleged and proven by the plaintiff.

**16.** Other circuits disagree as to whether plaintiffs must allege and prove culpable participation. *See, e.g., Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985) ("[G]ood faith and lack of participation are affirmative defenses in a controlling person action, and requiring them as part of the plaintiff's prima facie case while

allowing them as affirmative defenses, confuses the parties' responsibilities and unnecessarily burdens plaintiffs contrary to the plain meaning of the statute."); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 959 (5th Cir.1981) (burden of proving lack of participation and good faith is on the defendant); *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987) (culpable participation must be alleged to state a claim under § 20(a)).

**17.** Defendants' reliance on the court's recent decision in *Brickman v. Tyco Toys*, 731 F.Supp. 101 (S.D.N.Y.1990) (Carter, J.) is misplaced. The court in *Brickman* found that the plaintiff failed to plead the role of one of the defendants in the alleged fraud with the requisite degree of particularity as required by Rule 9(b), F.R. Civ.P., in that the plaintiff did not establish that the defendant, an outsider, had control. *See also Brickman v. Tyco Toys*, 722 F.Supp. 1054, 1061 (S.D.N.Y.1989) (Carter, J.). Requiring the plaintiff to allege some sort of culpable participation was appropriate in *Brickman* because it was the only way of establishing the defendant's control. Obviously, this is not the situation in the case at hand where the alleged controlling party is the sole shareholder of the controlled party.

ingly, defendants' motion is denied. This case will be added to the end of the civil ready calendar and the parties are directed to file a pre-trial order on or before May 11, 1990.

IT IS SO ORDERED.