**In re AMES DEPARTMENT STORES, INC. NOTE LITIGATION.**

**ACACIA NATIONAL LIFE INSURANCE CO.; Acacia Mutual Life Insurance Co.; Anthony Delano, on their own behalf and on behalf of all others similarly situated, Plaintiffs–Appellants,**

**v.**

**Peter B. HOLLIS; Earl M. Spector; James A. Harmon; Arthur F. Loewy; Maurice Segall; Michael D. Leavitt; Norman Ricken; Wertheim Schroder & Co. Incorporated; Coopers & Lybrand; Melvin M. Rosenblatt; Philip M. Chrusz; Duane R. Wolter; Norman Asher; TJX Companies, Inc., Defendants–Appellees.**

**No. 77, Docket 92–7306.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1992.

Decided April 2, 1993.

J. Daniel Sagarin, Milford, CT (Hurwitz & Sagarin, P.C., of counsel), for plaintiffs-appellants.

Robert P. Sugarman, New York City (Melvyn I. Weiss, Lee M. Ginsburg, Mil-

berg Weiss Bershad, Specthrie & Lerach, of counsel), for plaintiffs-appellants Acacia Nat. Life Ins. Co. and Acacia Mut. Life Ins. Co.

Arthur H. Abbey, New York City (Stephen T. Rodd, Abbey & Ellis, of counsel), for plaintiff-appellant Anthony Delano.

Andrew M. Schatz, Hartford, CT (Schatz & Schatz, Ribicoff & Kotkin, of counsel), for defendants-appellees Peter B. Hollis, Duane R. Wolter and Philip M. Chrusz.

Jeffrey B. Rudman, Boston, MA (William H. Paine, Hale and Dorr, Ralph G. Elliot, Hartford, CT, Susan A. Quinn, Tyler, Cooper & Alcorn, of counsel), for defendants-appellees James A. Harmon, Earl M. Spector, Norman B. Asher, Michael D. Leavitt, Norman Ricken and Melvin M. Rosenblatt.

Douglas H. Meal, Boston, MA (Ropes & Gray, Peter C. Schwartz, Hartford, CT, Gordon, Muir and Foley, of counsel), for defendants-appellees The TJX Companies, Inc., Maurice Segall and Arthur F. Loewy.

Lewis A. Kaplan, New York City (Jay L. Himes, Paul, Weiss, Rifkind, Wharton & Garrison, Jacob Zeldes, Bridgeport, CT, Zeldes, Needle & Cooper, of counsel), for defendant-appellee Wertheim Schroder & Co. Inc.

Alan Glickman, New York City (Linda J. Cahn, Schulte Roth & Zabel, Francis J. Brady, Hartford, CT, Murtha Cullina Richter & Pinney, of counsel), for defendant-appellee Coopers & Lybrand.

Before: OAKES, KEARSE and PRATT, Circuit Judges.

OAKES, Circuit Judge:

This appeal involves one of several securities fraud class action lawsuits brought by holders of securities in Ames Department Stores, Inc. ("Ames"), following that company's 1988 acquisition of the discount stores division of the Zayre Corporation ("Zayre") and subsequent descent into bankruptcy. The plaintiffs, holders of Ames Senior Subordinated Reset Notes (the "reset notes"),[1] appeal from a ruling of

---

**1.** Parenthetically, we note that the reason these were called "reset notes" was that they had an initial interest rate of 13 percent per annum for the first three years, but on May 15, 1992 and

the District Court for the District of Connecticut, Peter C. Dorsey, *Judge,* granting summary judgment for the defendants on statute of limitations grounds. The reset notes, the first of two debt issuances sold to the public during 1989 to help finance the Zayre acquisition, were issued in a $200 million public offering pursuant to a registration statement and a prospectus that became effective on May 16, 1989. The second, a $155.25 million convertible debenture offering, was issued pursuant to a registration statement and prospectus effective October 5, 1989.

The reset noteholders commenced these actions in early March, 1991, but the district court held that the one-year statute of limitations on these securities claims [2] had begun to run "as early as January 1990," when the noteholders knew that Ames's fiscal year 1990 would not be profitable. *In re Ames Dep't Stores, Inc. Note Litig.,* No. 2:90CV362 (PCD), slip op. at 8 (D.Conn. Feb. 10, 1992). This was two weeks before one of the plaintiffs, Anthony Delano, even purchased his reset notes. In any event, the district court held that there was no genuine issue of material fact as to when the statute began to run, and that the reset noteholders had "failed to offer credible evidence which would demonstrate a genuine issue for trial." In other words, the district court found that the reset noteholders should have been on notice of their claim in late 1989 or early 1990, basing this conclusion on (1) news articles and analysts' reports issued in late 1989 and early 1990, indicating that Ames would report a loss for its fiscal year ending January 27, 1990; (2) the decline in the market price of Ames common stock from October, 1989 into January, 1990; (3) Ames's January 10, 1990 announcement that it expected a relatively small year-end loss; and (4) the filing of a fraud complaint by an Ames common stockholder on January 11, 1990. While the court also relied upon the filing of an action by the holders of Ames convertible debentures, the first debentureholder action was not filed until April 16, 1990—less than one year before the two reset noteholders' actions was filed. Consequently, the district court's reliance on the debentureholders' filings, as evidence that the noteholders knew of their claims more than a year before filing suit, was unjustifiable. Because we hold that the noteholders have raised at least a factual question that they were not on notice of their claims until April, 1990, when the crippling extent of Ames's losses became clear, we reverse the summary judgment.

In order to evaluate the claims, however, we begin with a review of the factual background. In particular, we review the crucial public information which, according to the defendants and the district court, had alerted the noteholders to the possibility that they had been defrauded.[3]

## BACKGROUND

Ames, a successor to a business founded in 1958, was incorporated in Delaware in 1962. A successful discount department store chain, it steadily expanded through

each May 15 thereafter the interest rate was to be reset pursuant to a formula designed to permit the notes to trade at 101 percent of their par value or more.

2. The consolidated amended complaint asserts claims for relief under §§ 11, 12(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(2), and 77*o* (1988) and under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j and 78t(a) (1988), and Rule 10b–5, 17 C.F.R. 240.10b–5 (1992). There is also a count alleging common law fraud.

3. An opinion in a related appeal filed by Ames common stockholders, *In re Ames Dep't Stores, Inc. Stock Litig.,* 991 F.2d 953 which was consolidated with this case for purposes of oral argu-

ment, filed today, includes a discussion of much the same factual background. In that case, we reverse a dismissal of the common stockholders' second amended complaint for failure to state a claim. The factual discussion in that case, though in some respects duplicating the factual discussion presented here, is less complete and in minor respects inconsistent with the facts as presented in this opinion. The differences reflect the fact that this case comes before us on appeal from a grant of summary judgment, after the facts had been more thoroughly developed before the district court. In the stock case, we take the allegations of the stockholders' complaint as true; in this case, we draw all inferences in the light most favorable to the noteholders, the parties against whom summary judgment was sought.

the 1960s, '70s and early '80s. By 1970, it had 23 stores and annual sales of about $50 million. By 1985, its annual sales were approximately $300 million. In August, 1985, Ames more than doubled its size by acquiring the G.C. Murphy chain of 108 discount department stores and 144 variety stores with annual sales of $900 million. By the end of Ames's fiscal year ending January 30, 1988, Ames's annual sales had grown to more than $2 billion, and it had 321 discount department stores, 142 variety stores, and distribution centers in four states. Most of these stores were located in the Northeast.

Ames's rapid and apparently healthy growth over a 25-year period did not prevent it from having problems or differences of opinion among its directors. For example, the reset noteholders allege that, commencing in June, 1988, Ames's internal audit department circulated memoranda raising questions about the adequacy of the company's financial and accounting controls. A memo in August, 1988, for example, concluded that the controls were "unsatisfactory," and another in October, 1988 that "several inefficient and ineffective procedures ... may be indicative of control weaknesses and possible financial risk." Whatever problems existed were exacerbated when Ames acquired Zayre in 1988, an acquisition which was by no means unanimously approved by the Ames board.

In October, 1988, Ames acquired 392 Zayre discount stores for a purchase price of approximately $778,191,000 plus the assumption of certain long-term indebtedness and capital lease obligations, discounted 19.5% from the net assets on the balance sheet in light of certain problems at Zayre. For the second time in just over three years, the number of Ames's retail outlets doubled. The Zayre acquisition was favored and negotiated by Ames's CEO and President Peter B. Hollis and by its Board Chairman, defendant James A. Harmon, who also served as chairman and CEO of defendant Wertheim Schroder & Co., Incorporated ("Wertheim"). Wertheim previously had acted as an investment banker for Ames, and allegedly also acted as investment banker to both Ames and Zayre in their merger negotiations. In addition, Wertheim was the managing underwriter for the two offerings of debt securities issued to finance the acquisition.

Individual defendants include not only Hollis and Harmon but directors and/or officers Duane R. Wolter, Ames Executive Vice President and Chief Financial Officer; Philip M. Chrusz, through late 1989, Ames Senior Vice President and Chief Accounting Officer; Earl M. Spector, Executive Vice President, Secretary and member of the Board of Directors; Melvin M. Rosenblatt, Ames director, chairman of Ames's executive committee and member of Ames's audit committee; Norman Ricken, Ames director and chairman of the audit committee; Norman B. Asher, Ames director, member of Ames's audit and executive committees and outside counsel for Ames in connection with the acquisition and the reset note offering; Maurice Segall, an Ames director since the acquisition, member of the Ames audit committee and former CEO of Zayre; Arthur F. Loewy, an Ames director after the acquisition, member of the audit committee and a former Zayre financial officer; and Michael D. Leavitt, Ames director and member of the Ames audit committee. In addition to Wertheim, the corporate defendants are Coopers & Lybrand, the accountants who conducted the firm's audits, and The TJX Companies, Inc., ("TJX"), the successor to Zayre.

According to the prospectus issued for the reset note offering, management believed that, through the acquisition of Zayre, Ames would double its total assets, annualized revenues and retail selling space, and that the acquisition of operations in complementary geographic areas and favorable leases would enable the company to enter new markets and increase its penetration of existing markets. In addition, management believed the acquisition would give Ames access to greater financial resources and would increase efficiency in marketing and distribution. Two members of the Ames board, including one of the company's founders, argued against the acquisition on the bases that Zayre was

losing $125 million a year, that Ames would be strapped with payments to service an $800 million debt and would need operating earnings of approximately $225 million just to break even, and that the Zayre stores were mostly located in highly competitive urban areas where Ames itself had never been profitable. Indeed, Ames had lost $12 million in its few metro-urban stores during the fiscal year ending January, 1988, and made up for these losses with profits in its many rural or small-town stores. There apparently was further opposition because Ames's chairman Harmon had a conflict of interest: he was also CEO and chairman of defendant Wertheim; and Wertheim was representing both Ames and Zayre in the transaction, thus precluding negotiation of the most advantageous terms for Ames. Following the vote to enter into the Zayre acquisition, the two opposing members of the board of directors resigned.

The Zayre acquisition, if not the start of problems at Ames, certainly exacerbated them and added whole new congeries of problems to the overall operations of Ames. Two months after the Zayre acquisition, Coopers & Lybrand, hired to perform an audit of the acquired assets, told Ames that it was "unable to satisfy [itself] as to inventory quantities and related values or related accounts payable accounts" with respect to the acquired Zayre stores. An attempted revamp by Arthur Andersen & Co. of Ames's applications software allegedly was significantly complicated by the differences between Ames's and Zayre's computer hardware and applications systems. These attempted changes were dramatic and allegedly adversely affected the accuracy of Ames's financial reporting during late 1988 and 1989. Manual reviews apparently did little to solve the problem. The computer snafus resulted in an inability to convert certain of Zayre's warehouses to Ames's warehouses, causing a warehouse gridlock which led to overstocking and vendor processing delays and forced the company to stock its stores by using drop shipments at individual stores. The Zayre stores in areas where Ames had had no stores did not attract business under the Ames name, and the cancellation of Zayre

credit cards resulted in customer complaints and the loss of goodwill and customers. Beyond this, the Zayre stores were themselves losing money, their customer base was eroding, their inventories were overstated, and disaster beckoned on the near horizon for the combined enterprise.

## THE CRITICAL DOCUMENTS AND STATEMENTS

The first of the critical documents to which the reset noteholders look to support their securities claims is the 1989 Annual Report issued on May 10, 1989. Among other things, the report stated that "[w]e expect annual earnings to be higher than last year's...." The accompanying shareholders' letter, allegedly written by defendants Harmon and Hollis, announced that "[t]he integration of the Zayre stores with Ames is proceeding faster than we anticipated.... During this year we are confident that we can return the Zayre stores to ongoing profitability and blend our two chains into one well managed company." The letter touted the year as a "landmark," with anticipated sales increasing from $2 billion to $5 billion.

The Form 10–K for the fiscal year ending January 28, 1989 was filed with the SEC on May 10, 1989, the same day the Annual Report was released. All of the individual defendants are alleged to have signed the Form 10–K, which stated that "[t]he Company believes that the acquisition of the Zayre Discount Division will enable it to compete more effectively with other major retailers, and will provide it with a number of benefits...."

On May 16, 1989, Ames explicitly incorporated the 1989 10–K and 1989 Annual Report in the $200 million Reset Note Prospectus, including statements such as "[m]anagement believes that the acquisition ... presented a unique opportunity to acquire a major discount chain operating in complementary geographic areas." In addition, the prospectus suggested that the integration of the Zayre stores was proceeding smoothly:

The consolidation of home office functions is proceeding ahead of schedule and will be completed by October 1989, operating standards at the Zayre Discount Division stores are being improved, and all initial conversions to Ames stores are scheduled to be completed by November 1989, by which time all discount department store operations will be fully integrated. The Company also believes that it is making progress in maintaining adequate stocks of basic merchandise and supporting advertised merchandise with adequate inventories at the Zayre Discount Division stores.

It is alleged that at the time these statements were issued, sales at the Zayre stores were significantly below planned projections, and that there was a decline in Ames's working capital and an increase in inventory and other audit and control problems.

On May 31, 1989, Ames announced that it had suffered a loss for the first quarter of fiscal year 1990 of approximately $12.3 million as opposed to a net gain of approximately $5.9 million for the corresponding quarter the year before, but nevertheless allegedly stated in a press release that "we continue to expect that annual earnings will exceed last year's." In a press release issued the following day, June 1, 1989, Ames made a further attempt to dilute the news of the first quarter loss: it announced an improvement in its sales for May, the first month of the second quarter. In the press release, defendant Hollis was quoted as saying, "[w]ith the advent of better weather in late May, our sales returned to expected levels. We are looking forward to stronger sales for the remainder of this year."

On June 12, 1989, the company filed with the SEC its Form 10–Q for the first quarter ending April 29, 1989, again allegedly stating that "[t]he Company is on or ahead of schedule in integrating the Zayre stores.... [M]anagement continues to expect that annual earnings will exceed last years [sic]."

At the Annual Shareholders' Meeting on June 19, 1989, according to a press release issued that day, defendant Hollis told shareholders that "the Company anticipates that annual earnings would [sic] exceed last year's, with the bulk of the earnings improvement coming in the third and fourth quarters, as the consolidation of the Ames and Zayre chains gains momentum.... [O]ur consolidation of the Zayre stores is ahead of schedule."

These statements were issued despite the fact that internal projections allegedly showed a second-quarter loss of $5.3 million, creating a total year-to-date loss of $17.6 million, and allegedly providing no basis for projecting that sales for fiscal 1990 would improve to create any profit at all. The plaintiffs allege that the defendants made these statements despite knowing that Ames's financial difficulties were exacerbated by the computer conversion project. The noteholders allege that the computer conversion had increased the control problems already present in the company, resulting in an inability to guide shipments from warehouses to stores, to pay vendors properly, to determine net revenues, or otherwise to perform reliable profit and loss analyses.

As of September, 1989, an internal forecast presented to the board projected a $17.2 million loss for fiscal 1990. Nevertheless, on September 13, 1989, the company released its Form 10–Q for the second quarter ending July 29, 1989, complete with continued representations that the integration of the Zayre stores was faring well. The Form 10–Q, signed by defendants Hollis and Wolter, stated that "[t]he Company is on or ahead of schedule in integrating the Zayre stores" and that "[m]anagement expects that the changes now underway will allow the Company to take full advantage of economies of scale for the holiday selling season."

On October 5, 1989, Ames filed a $155.25 million convertible debenture offering [4] and

---

**4.** While the debenture prospectus lists only $135 million of debentures, a press release issued the same day indicated that Ames had granted the underwriters a 30-day option to purchase up to 20.25 million more in debentures. The underwriters exercised this option, and $155.25 mil-

in connection with it an Amended Registration Statement, a Final Prospectus and an accompanying press release. The reset noteholders rely on the debenture filings and particularly on the Final Prospectus statements that Ames had developed a detailed strategy for the integration of the Zayre Discount Division and was "on or ahead of schedule in implementing this strategy"; that "the Company has improved the in-stock position of basic merchandise"; and that "[t]he Company has significantly reduced overhead cost of the combined Zayre and Ames operations through the consolidation of home office, field management and distribution operations." As evidence of this so-called integration strategy, the prospectus stated that 74 under-performing Zayre stores had been closed and 53 of the related store leases were being disposed of, that a Zayre distribution warehouse and all the Zayre tire and lubrication locations had been closed; that conversion of 254 rural and suburban Zayre stores to Ames stores with an accompanying major advertising and promotional campaign would take place by November 1, 1989; and that state-of-the-art cash registers, a satellite communications system and other efficiency improvements were being introduced.

The Final Prospectus further emphasized Ames's introduction to Zayre stores of its marketing and merchandising strategy of "everyday low prices on selected items," together with periodic promotions, the upgrading of Zayre's operating procedures to conform with Ames's systems, and the reorganization of the combined distribution and management information systems. While the Final Prospectus reported that there had been a loss of $20.7 million in the first half of fiscal year 1990, ending July 29, 1989, it indicated that Ames itself had had an operating profit of $61.4 million, that operating expenses would be reduced in the second half of fiscal 1990, and that the margins from Zayre stores would increase. The Final Prospectus reassured investors that anticipated strong sales in the forthcoming holiday selling season would enable Ames to meet its selling goals, and said that the company's revolving credit facility would satisfy its working capital and capital expenditure requirements for the foreseeable future. The plaintiffs allege that these statements were false and that the defendants knew ·or should have known that the company was facing its third consecutive quarterly loss in the supposed turnaround quarter. The prospectus incorporated the 1989 Form 10–K, signed by all of the individual defendants, and the 1989 Forms 10–Q, signed by defendants Hollis and Wolter, which allegedly included similarly misleading statements.

On or about October 26, 1989, Ames issued a press release in which Defendant Hollis stated that "[t]oday marks an exciting benchmark in Ames' growth," and commented upon Ames's implementation of its merchandising and pricing policies, including the installation of advanced cash registers and related back-office systems at the Zayre stores and the introduction of a satellite communications network for tracking inventory price changes, credit card approvals, and the like. The October 26 press release was followed up on November 7, 1989, by a press release stating that Ames had experienced a 103.3 percent increase in sales for the four weeks ending October 28, 1989.

On November 30, 1989, Ames, through Defendant Hollis, issued a press release reporting Ames's results for the third quarter of fiscal 1990 ending October 28, 1989. This release reported an operating profit of approximately $58 million, but a net loss (before an extraordinary charge) of $1.9 million or 14 cents per share. In the third quarter of 1988, by contrast, Ames had posted net earnings of $10,662,000 or 28 cents per share. The release also reported a $5,057,000, or 13 cents per share, extraordinary charge from the extinguishment of debt incurred in connection with the Zayre acquisition. Nevertheless, the press release emphasized Ames's success at converting Zayre stores to Ames stores, stating that

lion worth of debentures were sold. The interest rate on the debentures was to be 7½ percent.

[f]rom a strategic standpoint, we achieved what we set out to accomplish.... With our newly-converted and well-stocked stores, we have met our goal of being ready for the holiday season. Although sales in the former Zayre stores during November have been below our expectations and below last year, at this point we still expect an increase in earnings for the fourth quarter and expect the full year to be profitable.

On or about December 8, 1989, Ames sent a special report to its shareholders, commenting favorably on third-quarter results and on the "well-executed" October conversion of 254 Zayre stores to Ames stores.

On December 12, 1989, Ames filed its Form 10–Q for the third quarter ending October 28, 1989, in which, the reset noteholders allege, it reported that revenues had nearly doubled during the quarter. The noteholders also allege that this report was false and misleading. They claim that defendants knew or should have known that the quarter had not produced the publicly anticipated turnaround; indeed, according to the debentureholders, Ames had overstocked its inventory by more than $175 million even though it was incurring decreases in Zayre store sales and in November sales for the entire chain. On December 14, Ames declared its regular quarterly dividend, despite the fact that losses from operations and chargeoffs were occurring.

On or about January 4, 1990, Ames issued a press release reporting a modest decrease in sales for December, 1989, but otherwise portraying a picture of financial health for fiscal 1990:

> Ames ... today reported December sales of $829 million, a 2.9 percent decline from last year's adjusted total of $854 million. Last year's sales have been adjusted to reflect the December 1988 closing of 74 Zayre stores and the September 1989 sale of the company's variety-store operations.

Comparable-store sales for December increased 5.1 percent in Ames' discount department stores. Comparable-store sales declined approximately 13 percent in the 315 stores acquired from Zayre in October 1988.

Peter B. Hollis, Ames president and chief executive officer, said, "We are pleased with sales in our 375 original Ames stores. December sales in the acquired stores were below our expectations. Our sales results were achieved in an extremely competitive holiday selling season, particularly in the Northeast, where we believe the economy has slowed." [5]

What this release did not disclose was that December sales had fallen short of Ames's expectations by $94 million, and that this, together with a decline in profit margin rates, had produced a margin shortfall of approximately $40 million.

On or about January 10, 1990, Ames issued a press release very critical to this case which, among other things, stated that Ames expected to report a profit for its fourth quarter but that it did not expect earnings to be sufficient to produce a profit for the year. We quote from it as follows:

> We were pleased with the holiday season performance of the original 375 Ames stores, which had a comparable-store sales gain of 5.8 percent. But because of soft sales at the 315 Zayre stores acquired in 1988, we no longer expect fourth-quarter earnings to be sufficient to show a profit for the year.
>
> Our results were hampered by a soft economy, particularly in the Northeast, and an intensely competitive holiday selling season. Our profit shortfall is due entirely to a sales shortfall at the acquired stores, despite a significant reduction in the Zayre historic expense level. The Ames stores continue to perform well.

In addition, the release stated that "[w]e are convinced that these [Zayre] stores can and will become profitable, even at sales

---

**5.** From the first paragraph of this release, it appears that in September, Ames had to sell off at least a major portion of its 1985 acquisition of the G.C. Murphy chain stores in an effort to salvage its 1988 acquisition and its own profitability—a tipoff that things were not going well.

levels that will be initially lower than we thought."

On or about February 1, 1990, Ames issued a press release stating that its sales for the month of January were $230 million and that its sales for the fiscal year ending January 27, 1990 had increased some 50.6 percent over the comparable period in 1989, but did not mention the possibility that Ames would suffer an unprecedentedly large loss in fiscal 1990. On March 19, 1990, however, Ames announced that it was suspending payment of its quarterly dividend; on March 22, it announced that it was replacing Hollis as president of the company. Hollis, however, retained his position as CEO of Ames.

On April 9, 1990, Ames announced that it expected to report a net loss for the fiscal year ending January 27, 1990 of $228 million. According to the release, approximately $150 million of the loss was for the establishment of an after-tax restructuring reserve to cover the cost of closing the 74 unprofitable Zayre stores. Ames further stated that it was negotiating with its banks for a new credit agreement, and that it had retained investment bankers to assist the company in connection with a restructuring. Disaster, however, had struck. The price of the common stock, which had already endured a steady decline in the late months of 1989, and dropped several points after the January announcement of a small loss, plunged; the price of the reset notes and the convertible debentures, which thus far had been relatively stable, now collapsed as well. On April 25, Ames filed for bankruptcy.

With the release of formal financial data for the year, it became clear that even the April 9 announcement had understated the problems. The Form 10–K for the fiscal year ending January 27, 1990, filed on or about May 14, 1990, not only referred to a $137 million restructuring charge for the closing of Zayre stores, but also to an extraordinary charge of over $8 million for writing off deferred financing costs associated with the prepayment of debt, a $33 million adjustment for inventory shrinkage, a $13 million adjustment to state inventory accurately, and a $24.8 million adjustment for special markdowns on certain merchandise. The 10–K also reported declining sales at the former Zayre stores, increasing inventory levels throughout the chain, problems with the integrated computer system and delays in the distribution system. The Form 10–Q for the disastrous quarter ending April 28, 1990, filed on or about June 15, 1990, reported a net loss for the quarter of $430,909,000, including an additional $225 million for the closing of certain stores and distribution facilities, and another $104.5 million for markdowns in respect to inventory.

## THE STOCKHOLDERS' AND DEBENTUREHOLDERS' ACTIONS

In response to these developments, the common stockholders filed suit in January, 1990, and the debentureholders filed suit on April 16, 1990 (not, as the district court suggested, in January, 1990). As the district court relied in part on the filing of these suits for its conclusion that the reset noteholders should have known of their claims, we review the substance of the stockholders' suit briefly. We note, however, that the stockholders' initial complaint was quite brief, included no discussion of the computer problems which allegedly contributed substantially to the financial misreporting central to the noteholders' claims, and in April, 1991, despite amendments filed in August, 1990 which are not included in our record, was dismissed for failure to state a claim. The second amended complaint, set forth in detail in *In re Ames Dep't Stores, Inc. Stock Litig.*, filed today, is a different kettle of fish. However, this amended complaint was not filed until June 17, 1991.

The basic substance of the stockholders' claims, however, was quite similar to those the reset noteholders have alleged: the stockholders' complaint alleged that seven directors and officers of Ames and Ames investment banker Wertheim disseminated more than 30 documents into the market for Ames securities which contained materially false and misleading statements con-

cerning Ames's financial health, its future profitability, and the success of Ames's integration of the newly-acquired Zayre stores. The stockholders relied on essentially the same documents as do the noteholders, including press releases, annual reports, quarterly and annual filings with the SEC, and the prospectuses for the two debt offerings, all of which painted a rosy picture of Ames's profitability and future.

## NEWS ITEMS AND ANALYSTS' REPORTS

While we have already discussed the documents issued by Ames itself, to evaluate the statute of limitations issue we must also consider the news articles and analysts' reports and the decline in market prices of Ames common stock, on which the district court relied. Without spelling them all out in detail, the district court may be taken to have relied upon the following news items and analysts' reports:

1. A Wall Street Journal and Dow Jones newswire report dated November 30, 1989, following an Ames press release, indicating that Ames had said that its sales for the four weeks ending November 25 were $479 million, a 2.8 percent decline from adjusted sales, and noting that year-to-date results from the preceding four weeks and from the 43 weeks ending November 25 had not been adjusted to exclude sales from 74 Zayre stores closed in December, 1988 or sales from Ames variety-store operations sold in September. This wire also reported that November sales for Zayre stores were below company expectations and below the preceding year by about 15 percent.

2. A Salomon Brothers report dated December 8, 1989, reporting significantly reduced earnings estimates arising from the "disappointing performance of the Zayre stores" and stating that estimated earnings were reduced from $2.15 to $1.25 per share for 1990 but "in all fairness" noted "that the potential range of results is wide."

3. A report in Barron's dated January 8, 1990, quoting the December Salomon Brothers report, in which an investment analyst for the firm stated "we recently downgraded our investment opinion to neutral from a purchase recommendation" and "significantly reduced our earnings estimates."

4. A similar Goldman Sachs & Co. analysis done by Stephen Mandel, under a date that does not appear in our record, commenting to the same effect on November sales and the Zayre acquisition, and noting that "the sales decline in the Zayre stores is very disconcerting ... both from the standpoint of its magnitude and given Ames's heavily leveraged balance sheet."

5. A Wall Street Journal article by a staff reporter, appearing at page A10 on December 28, 1989, entitled "Digesting Zayre Gives Ames Heartburn." The article noted that the third quarter of 1989, which had been advertised as the turnaround quarter, had not resulted in a "turn," and attributed that to the "continuing problems at the old Zayre stores." The article also quoted an analyst's remark that the Zayre acquisition was "a case of a guppie swallowing an Atlantic salmon.... The company's ambition exceeded its grasp."

6. Ames's January 4 press release, discussed above, and picked up by the Dow Jones newswire service on January 4, 1990 and by a number of newspapers on January 5, in which Ames announced December sales of $829 million, a 2.9 percent decrease overall, with a 5.1 percent increase in sales at Ames discount department stores but a 13 percent decrease in sales in the 315 stores acquired from Zayre. It was in this press release that defendant Hollis announced that while December sales in the acquired stores were below expectations, "[o]ur sales results were achieved in an extremely competitive holiday season, particularly in the Northeast, where we believe the economy has slowed."

7. A January 4, 1990 United Press International release on U.S. retail sales, under the byline of Isabelle Clary, reporting that Ames had bucked an upward trend with its 2.9 percent decrease in December of 1989 and repeating Hollis's statement that the disappointing results reflected the slowdown in the economy of the Northeast.

8. A January 5, 1990 Boston Globe Economic Section piece, under the byline of Barbara Carton, reporting that locally "the worst large performer [during the holiday season] appeared to be the 315 former Zayre stores which were acquired last October by Ames Department Stores, Inc. ..." This article, too, repeated Hollis's statement attributing the problems to the economy in the Northeast.

9. A January 10, 1990 story published both in the Wall Street Journal and via the Dow Jones newswire, reporting that Ames expected to report a loss for the fiscal year ending January 27, 1990 because of soft sales at the Zayre stores. The story alluded to Hollis's previous news release about the sales shortfall at the acquired stores which nevertheless asserted that "the Ames stores continue to perform well," and quoted Josephthal & Co.'s director of research, Janet Mangano, as saying that Ames's "expectations for sales growth were too high" and that the company had overestimated the value of the Zayre name—that the Zayre locations "are good but they don't need to be Zayre's." It also reported the comments of a retail analyst for a Los Angeles firm that the Northeast market was the most competitive in the country, but that Ames's long-term prospects were "good."

10. January 10, 1990 Reuters, United Press International and Associated Press dispatches reporting on Ames's January 10, 1990 press release announcing a $27.7 million loss for the first three quarters of fiscal year 1989 and the company's expectation that it would post a loss for the full year as well.

11. A January 11, 1990 piece by a Wall Street Journal staff reporter, appearing at page A4, essentially reiterating Ames's January 10 press release and pointing out that in New York Stock Exchange trading on January 10 the stock fell ⅞ to close at $8.125, repeating the analysts' quotations reported in the Journal's January 10 article discussing Ames's travails, and noting the company's announcement that it would be absorbing an extraordinary charge for early debt extinguishment.

12. A January 11, 1990 Newsday, Inc. Business Section piece reading, in part:

> So long, Zayre. Ames Department Stores, Inc. will slash 85 jobs in its corporate offices and eliminate the Zayre name by renaming 61 slumping Zayre stores as Ames Outlets. The discount retailer acknowledged that it had overestimated customer loyalty to the 392 Zayre stores it bought in 1988.

13. A January 11, 1990, 62-word New York Times article reporting the cutting of jobs, the renaming of the last surviving Zayre stores as Ames Outlets and the fact that a sluggish fourth quarter would prevent the company from showing a profit.

14. A January 11, 1990 Boston Globe piece headlined "Ames Loss Blamed on Zayre's Old Stores," pointing out that some Zayre customers had not readily accepted the Ames merchandising philosophy, but quoting an Ames spokesman to the effect that "we have achieved those things that had to be done to restore the Zayre stores to profitability. The only thing that has not taken place is stabilizing sales."

15. A January 11, 1990 Washington Post article mentioning only that Ames was cutting 85 jobs and eliminating the Zayre name by renaming the 61 remaining Zayre stores Ames Outlets.

16. A January 11, 1990 Women's Wear Daily piece reporting the cutting of the 85 jobs, the $27.7 million loss for the first nine months, the stock decline of ⅞, and the charge for early debt extinguishment.

17. Finally, a January 15, 1990 report in the Investment Dealers' Digest, Inc.'s *Mergers & Acquisitions Report,* headlined "Ames Needs Rolaids for Zayre's Indigestion." The report was basically favorable, however, saying that "Wall Street hasn't given up hope" and that "[a]nalysts generally believe that Ames made the right decision when it bought Zayre for $778 million," discussing the reports pertaining to the Zayre acquisition, and quoting a securities analyst for the Advest Group who said "I still think they can pull it off. I think they can make it work." This piece also referred to Salomon Brothers' downgrad-

ing of its investment recommendation to "neutral" and other analysts' changing their recommendations from "buy" to "hold," but nevertheless noted "[o]n the positive side [that] Ames reduced the amount of its long-term debt and capital leases [by $250 million] in 1989" and "successfully integrated the back-office operations of both Ames and Zayre," although taking six months longer to do so than the company originally had expected.

### DECLINE IN THE PRICE OF AMES COMMON STOCK

The district court also referred to the decline in the market price for Ames common stock prior to January 10, 1990 as information that put the reset noteholders on notice of their claims. Without commenting on the merits of that suggestion, for the record that stock traded between $15 and $16 from April through July, 1989, reached a closing high of $19 in mid-August, was steady in the $16–17 range from mid-September through late October, closed at $14 on November 29, at $11 on December 4, at $9 on December 18, and hit $7 on January 11, after reaching $10 again over the Christmas holidays. After the January 10, 1990 announcement, which was the first indication that Ames would sustain a year-end loss, the stock generally traded between $5 and $7 per share, and temporarily reached $4 on March 22 (after Ames announced that it would pay no dividends and that it had replaced its CEO, Hollis); after the April, 1990 announcement of the full scale of the collapse, the stock plummeted to $2.37 a share.

In contrast, as we discuss below, the price of the debt securities was relatively stable until March, 1990.

### DISCUSSION

The noteholders raise claims under §§ 11 and 12(2) of the 1933 Securities Act, 15 U.S.C. §§ 77k and 77l (2) (1988), as well as under § 10(b) of the 1934 Exchange Act, 78 U.S.C. § 78j(b) (1988). As we have already noted, the district court granted the defendants' motion for summary judgment, hold-

ing that all of the plaintiffs' claims were time-barred.

■■ The statute of limitations for claims under §§ 11 and 12(2) of the Securities Act is set forth in § 13 of the Securities Act, which provides that actions must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence ... [but i]n no event ... more than three years after the sale." 15 U.S.C. § 77m (1988). A plaintiff is held to the constructive notice standard set forth in § 13 "where the circumstances are such to suggest to a person of ordinary intelligence the probability that he has been defrauded." *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (quoting *Higgins v. Crouse*, 147 N.Y. 411, 416, 42 N.E. 6 (1895), for aid in interpreting New York's statute of limitations for common law fraud, not § 13).

The statute of limitations for actions brought under § 10(b) of the Exchange Act, set forth in § 9(e) of the Exchange Act, provides that "[n]o action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i (1988). *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991); *Ceres Partners v. GEL Assocs.*, 918 F.2d 349 (2d Cir.1990). The parties dispute the meaning of this provision, with the defendants claiming it requires inquiry notice, like § 13 of the Securities Act, and the plaintiffs arguing that the differences in the language of § 13 of the Securities Act and § 9(e) of the Exchange Act demonstrate that the latter requires only actual discovery of the violation. The *Lampf* Court explicitly declined to rule on the meaning of the language variation, —— U.S. at —— n. 9, 111 S.Ct. at 2782 n. 9, and we need not address the issue to decide this case. The record provides support for the plaintiffs' view that they neither should have learned nor actually did learn of the

possibility that they had been defrauded until April 10, 1990, less than one year before they filed these claims. Consequently, we need not treat the two statutes of limitations separately.[6]

The district court, however, held that both one-year statutes of limitations began to run in January 1990, at which time it found that the reset noteholders were put on notice of their claims by news articles and analysts' reports, by the decline in the market price of Ames stock between October, 1989 and January, 1990, by Ames's January 10 announcement that it expected to post a relatively small year-end loss, and by the filing of a fraud complaint by an Ames common stockholder on January 11, 1990. The first Ames reset note action was filed on March 5, 1991, and the second, which was subsequently consolidated with the first, was filed on March 8, 1991.

■ The noteholders, of course, claim that they were not on notice of their federal securities law claims until the April 10, 1990 announcement of the net loss of $228 million for the fiscal year ending January 27, 1990. They have certainly presented evidence to support this view which should have precluded the grant of summary judgment on statute of limitations grounds. The information available in January arguably gave only a hint of the debacle that was to come in April. Furthermore, the factual claims made in the noteholders' complaint are necessarily more complex than those made in the initial stockholders' complaint. A reasonable juror certainly could have found that the noteholders had insufficient information to make these allegations in January. The noteholders rely upon the inaccuracy and unreliability of Ames's financial statements during 1989 and early 1990, and in particular upon allegations that the revamping of computer software adversely affected the accuracy of Ames's financial reporting, causing the company to inflate earnings and understate losses, to defer financing fees improperly and to overstate inventory values by some

$500 million. They place great emphasis on shrinkage problems and other marketing deficiencies, which allegedly resulted from the problems of merging Zayre into Ames.

Nor did even the January 10 announcement pose as great a concern for the noteholders as it did for the stockholders. It is important to note that the interest payment due and owing on the Reset Notes on November 15, 1989 was paid, and that no other payment was due until May 15, 1991. The market price of Ames reset notes remained steady at at least $800 per thousand dollars face amount of the note through February 19, 1990. According to the plaintiffs' experts, whose affidavits were submitted in opposition to the summary judgment motion, this drop was neither precipitous nor unusual. More significantly, the market price for the reset notes did drop from $800 to $225 between the end of February and the end of April, 1990, a decline occurring, in part, within one year of the time plaintiffs commenced this action. We agree with the noteholders that the fact that the market price for the Ames reset notes did not appreciably decline in late 1989 or early 1990 when the market price of Ames common stock lost half of its value is neither remarkable nor inconsistent with the fact that holders of equity securities often, perhaps usually, have different concerns from those of holders of debt securities. What primarily matters to the latter is that the company meet its obligations on the debt instrument when due. In contrast, investors in equity securities generally are concerned with a company's earning prospects since equity securities usually trade, to a greater extent, on a company's earnings outlook. The prospects for a loss in a given quarter or fiscal year are thus much more likely to affect the price of an equity security than the price of a debt security, though signs of earning weakness may have an effect, as they did here, on the market for the debt security as well.

**6.** As counsel for Wertheim has noted, this court recently held that only inquiry notice is required. *Menowitz v. Brown,* 991 F.2d 36 (2d Cir.1993) (per curiam). This does not change our analysis, as we conclude that a question of material fact exists as to whether the information available to these plaintiffs sufficed to put them on notice of their claims.

We think the late 1989 and January, 1990 news releases and analysts' reports concerning Ames's situation could not have served to put the Ames noteholders on notice of the alleged fraud as a matter of law. Certainly, the January 10 press release, which indicated that Ames believed it would have a profit for the fourth quarter, that the Ames stores were performing profitably, that the Zayre stores would again be profitable even at lower sales levels and that the decline in sales at the Zayre stores was due in large part to events beyond company control, such as the soft Northeast economy and the intensely competitive holiday selling season, was no red flag to the noteholders, let alone a signal that the Ames ship was about to sink. True, the release said that the company expected to report a loss for the year because of the Zayre store soft sales, and spoke of an elimination of 85 positions at company headquarters and the tabling of plans to raise staffing levels there. But very few corporations issue wholeheartedly optimistic reports. The analysts' guarded reports following the January 10 release support the noteholders' position that they could not have been on notice of the impending collapse; they detected at most distress signals, as reflected by the modest decline in the market value of the notes. We agree with the noteholders that the decline in the market price of Ames common stock and the filing of a class action suit by an Ames common stockholder do not provide any basis for finding as a matter of law that the reset noteholders were on notice of their fraud claims by January 11, 1990. There are a lot of stockholders' suits out there, so to speak.

In short, the noteholders' case is a paradigm for the denial of a summary judgment. Accordingly, we reverse the grant of summary judgment. Reinstatement of the federal claims carries with it the reinstatement of the pendent state law claims.